1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10    ADAM DUNAKIN,                                  CASE NO. C14-0567JLR

11                            Plaintiff,             ORDER ON MOTIONS TO
                                                     DISMISS, FOR CLASS
12                       v.                          CERTIFICATION, AND FOR
                                                     PARTIAL SUMMARY
13    KEVIN W. QUIGLEY, et al.,                      JUDGMENT

14                            Defendants.

15                          **I.      INTRODUCTION**

16          Plaintiff Adam Dunakin is a 34-year-old man with a developmental disability, who

17    has lived in nursing facilities for more than eight years.  (Compl. (Dkt. # 1) ¶ 5.)  He

18    alleges that Defendants Kevin W. Quigley, in his official capacity as Secretary of the

19    Washington State Department of Social and Health Services ("DSHS"), and Dorothy F.

20    Teeter, in her official capacity as Director of the Washington State Health Care Authority

21    ("HCA"), have failed to provide him with screenings and evaluations, specialized

22    services, and notice of or planning for eventual community placement as required

ORDER- 1

1   pursuant to the Nursing Home Reform Act ("NHRA"), 42 U.S.C. § 1396r, and other

2   laws.  (*See generally* Compl.)  He further alleges that these failures have resulted in his

3   continued institutionalization and unnecessary isolation.  (*See id.* ¶¶ 5, 12, 32.)  He brings

4   his complaint on behalf of himself and a putative class of other residents of privately-

5   operated, Medicaid-certified nursing facilities in Washington State who are similarly

6   situated.  (*Id.* ¶¶ 14-20.)

7       Before the court are three motions.  Mr. Dunakin brings (1) a motion for class

8   certification (Mot. for Cert. (Dkt. # 16)) and (2) a motion for partial summary judgment

9   (PSJ Mot. (Dkt. # 17)).  Defendants bring a motion for judgment on the pleadings and

10  partial summary judgment (Rule 12(c) Mot. (Dkt. # 24)).   The court has reviewed the

11  parties' motions, all submissions filed in support of and opposition thereto, the balance of

12  the record, and the applicable law.  Being fully advised,[1] the court GRANTS Mr.

13  Dunakin's motions for class certification and partial summary judgment and GRANTS in

14  part and DENIES in part Defendants' motion for dismissal on the pleadings and partial

15  summary judgment.  However, with respect to the one portion of Defendants' motion to

16  dismiss that the court grants, the court also grants Mr. Dunakin leave to amend his

17  complaint.

18  //

19  //

20

21      [1] No party has requested oral argument, and the court deems oral argument to be
22  unnecessary to its disposition of all these motions.

ORDER- 2

## II.     BACKGROUND

### A.  Procedural History

Mr. Dunakin filed his complaint on April 16, 2014.  (*See generally* Compl.)  The complaint enumerates six claims for relief.  (*See generally id.*)  Mr. Dunakin's first claim is based on Defendants' alleged violations of certain provisions of the NHRA.  (*Id.* ¶¶ 33-34.)  His second and third claims are based on alleged violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  (Compl. ¶¶ 35-42.)  His fourth claim alleges violations of certain provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(B)(i), 1396n(c)(2)(B).  (Compl. ¶¶ 43-44.)  His fifth and sixth claims seek declaratory and injunctive relief and are derivative of his first four claims.  (*See id.* ¶¶ 45-48.)  Mr. Dunakin brings these claims on behalf of himself and a putative class of similarly situated residents of privately-operated Medicaid-certified nursing facilities in Washington State who have intellectual disabilities or related conditions.  (*Id.* ¶¶ 14-20.)  Defendants filed an answer to Mr. Dunakin's complaint on May 8, 2014.  (Answer (Dkt. # 8).)

Pursuant to the court's scheduling order (Sched. Ord. (Dkt. # 9)), Mr. Dunakin filed a motion for class certification on October 17, 2014 (*see generally* Mot. for Cert.), as well as a motion for partial summary judgment on the issue of the proper standard for PASRR screenings and evaluations (*see generally* PSJ Mot.).  On November 10, 2014, Defendants filed a motion for dismissal on the pleadings of all of Mr. Dunakin's claims

1  and for partial summary judgment on two portions of his fourth claim under Title XIX of

2  the Social Security Act.  (*See generally* Rule 12(c) Mot.)

3  **B.  The PASRR Process**

4  In 1987, Congress passed the NHRA to end the practice of inappropriately placing

5  individuals with intellectual disabilities and related conditions in nursing facilities

6  without providing services for their unique needs.  *See Rolland v. Romney*, 318 F.3d 42,

7  46 (1st Cir. 2003).  As directed by the NHRA, the Center for Medicaid and Medicare

8  Services ("CMS") issued regulations to screen and assess individuals with intellectual

9  disabilities and related conditions seeking admission to or residing in Medicaid-certified

10 nursing facilities, including privately-operated nursing facilities.  *See Rolland v. Cellucci*,

11 52 F. Supp. 2d 231, 235 (D. Mass. 1999); 42 C.F.R. § 483.100, *et. seq.*  This screening

12 and assessment process is known as the Pre-Admission Screening and Resident Review

13 ("PASRR") process.  42 U.S.C. § 1396r(e)(7)(A).  Under the PASRR process, Medicaid

14 recipients with intellectual disabilities and related conditions who are in or seek

15 admission to nursing facilities must be screened and evaluated to determine whether they

16 could be served in a community setting and require specialized services related to

17 training, therapies, or other means of accomplishing improved functioning.  *See Romney*,

18 318 F.3d at 46.

19 The NHRA requires that states accepting federal Medicaid funds have a screening

20 plan, specifically a PASRR plan, to ensure that decisions to place individuals in nursing

21 facilities are made appropriately.  42 U.S.C. § 1396r(e)(7)(A)(i); 42 C.F.R. § 483.104.

22 The federal regulations developed under the NHRA require two levels of PASRR

evaluations.  Level I of the PASRR process requires that the State "identify all
individuals who are suspected of having [an intellectual disability]" and who are being
referred to a nursing home.  42 C.F.R. § 483.128(a).  PASRR "Level II is the function of
evaluating and determining whether [nursing facility] services and specialized services
are needed."  *Id*.

Within DSHS, the Developmental Disabilities Administration ("DDA") has
responsibility for Washington State's PASRR program.  *See* 42 C.F.R. § 483.100 ("The
requirements of 42 C.F.R. §§ 483.100 through 483.138 governing the State's
responsibility for . . . PASRR . . . of individuals with . . . intellectual disability are based
on section 1919(e)(7) of the Act"); (Hehemann Decl. (Dkt. # 28) ¶¶ 3-4.)  DDA also
provides services to individuals with developmental disabilities under state law.  *See*
RCW ch. 71A.  The PASRR process and the process for determining whether an
individual is eligible for state services from the DDA are separate processes, although
both programs are administered through DDA.  (*See* Manion Decl. (Dkt. # 27) ¶ 4.)  In
Washington, HCA is the designated "single state agency" for Medicaid purposes, and
provides oversight of certain DSHS and DDA programs and functions.  *See* RCW
74.04.050.

On September 25, 2014, DSHS described the PASRR process as it relates to
individuals with intellectual disabilities or related conditions in guidance it issued to all
Washington nursing facilities as follows:

> PASRR is a long-standing federal requirement (42 CFR § [sic] 483.100-
> 138) to ensure that individuals with . . . intellectual disabilities or related
> conditions (ID/RC) are not inappropriately placed in nursing facilities for

long term care.  PASRR requires that all applicants to a Medicaid-certified nursing facility:

> 1)  Be evaluated for . . . ID/RC;
> 2)  Be offered the most appropriate setting for their needs (in the community, a nursing facility, or acute care settings); and
> 3)  Receive the services they need in those settings.

The PASRR process begins with a Level I screening which is used to identify those who may meet the criteria to be evaluated for specialized services.  **The Level I screen must be performed prior to admission**. . . .

The nursing facility is responsible for ensuring that the [Level I] form is complete and accurate before admission.  After admission, the NF [nursing facility] must retain the Level I form as part of the resident record.  In the event the resident experiences a significant change in condition (either as a major improvement or decline in condition), or if an inaccuracy in the current Level I is discovered, the NF must complete a new PASRR Level I and make referrals to the appropriate entities if a[n] . . . intellectual disability or related condition is identified or suspected . . . .

If . . . ID/RC is identified or credibly suspected, a Level II evaluation is required to confirm that identification, determine whether the individual requires nursing facility level care, and determine whether specialized services are required.  With some exceptions, the Level II evaluation **must be completed prior to admission.**

(Hamburger Decl. (Dkt. # 21) Ex. D at 1 (bolding in original).)  Defendants also state that if, upon review of a resident's file, it becomes apparent that no Level I screening was performed, or it was done incorrectly, then the nursing facility or the PASRR assessor should complete a new PASRR Level I screening and refer the resident for a PASRR Level II assessment, if indicated.  (PSJ Resp. at 4 (citing Hehemann Decl. ¶ 6); *see also* Hehemann Decl. ¶ 10.)

//

//

ORDER- 6

### C.  Recent PASRR Process Violations in Washington State

On November 13, 2013, CMS issued to DSHS and HCA a notice of multiple PASRR violations with respect to 27 residents, whom DSHS transferred in 2011 from Lakeland Village Intermediate Care Facility, a state-operated Residential Habilitation Center ("RHC") for individuals with developmental disabilities, to the Lakeland Village nursing facility.  (Kas Decl. (Dkt. # 20) ¶¶ 9-11, Ex. D.)  Indeed, CMS found that DSHS had violated federal PASRR requirements thousands of times for just the 27 individuals involved in CMS's investigation.  (*Id.*)  CMS found that the residents of Lakeland Village had been transferred to the nursing facility without screening, evaluation, or the provision of specialized services.  (*See id.* Ex. D.)

Since November 2013, Defendants have operated under a plan of "remediation" with CMS related to Defendants' state-operated Medicaid-certified nursing facilities. (*See* Hamburger Decl. Ex. A at 52:2-16, 146-49.)  The "remediation" plan, however, does not include privately-operated Medicaid-certified nursing facilities.  (*See id.*; *see also id.* Ex. C.)  In a 2014 supplemental budget request, DSHS requested and obtained additional funding to remediate its PASRR program to comply with federal Medicaid requirements at state-operated DDA nursing facilities.  (*See generally id.* Ex. C.)  However, DSHS did not request additional funding for PASRR at privately-operated nursing facilities, in which approximately 300 people with developmental disabilities presently reside.  (*Id.* at 06009150 ("These immediate steps to address the issues with the state-run RHC nursing facilities do not address the issue of the approximately 300 people with a developmental disability who are currently in community nursing facilities.").)  Nevertheless, the state is

1  responsible for conducting PASRR assessments upon admission or significant change in

2  medical status with respect to these individuals.  (*Id.*)

3        During the conduct of discovery in this lawsuit, Defendants' testimony or

4  documentary evidence otherwise provided support for the following assertions by Mr.

5  Dunakin concerning Defendants' compliance with federal PASRR requirements for

6  residents of privately-operated nursing facilities:

7        • Defendants do not have systematic method for identifying and
            screening residents of privately-operated nursing facilities for
8            intellectual disabilities and related conditions.  (Praecipe to
            Hamburger Decl. Ex. E (Dkt. # 32) (attaching Rule 30(b)(6)
9            Deposition of Terry Hehemann of DSHS) at 109:18-110:2 (stating
            DSHS has "no clear means to absolutely identify who does and who
10           [does not] need PASRR Level II" evaluations).)

11       • Defendants have not conducted complete PASRR evaluations for all
            of the individuals they have identified with intellectual disabilities or
12           related conditions living in privately-operated nursing facilities, and
            although Defendants had a "goal" of completing these evaluations
13           "by the end of 2014," they have no concrete deadline for doing so
            because they "have no clear means to absolutely identify who does
14           and who [does not] need PASRR Level II."  (*See id.*; *see also*
            Hamburger Decl. Ex. E (attaching Rule 30(b)(6) Deposition of Terry
15           Hehehman) at 99:18-22; *id.* Ex. A (attaching Rule 30(b)(6)
            Deposition of Don Clintsman of DSHS) at 140:1-17 ("We're
16           working on the community, getting those done, the 350 done.").)[2]

17       • Defendants presently have no formal tracking system to monitor
            whether specialized services identified as a result of a PASRR
18           evaluation are actually provided, although DSHS is moving to an

19       _____

20       [2] Defendants provide testimony that they have now reassessed approximately 270
    individuals in privately-operated Medicaid-certified nursing facilities, which they also state
21   represents over 90% of the individuals who they initially contemplated might require review.
    (Hehemann Decl. ¶ 6.)  However, as discussed below, the evidence before the court does not
    indicate that this review was completed using the correct standard for PASRR.  (*See infra* §§
22   II.F, III.C.2.)

ORDER- 8

electronic system that will be able to provide such tracking in the future.  (Hamburger Decl. Ex. E at 119:7-121:3.)

- Defendants have no quality assurance system in place to ensure the proper and timely provision of PASRR screening, evaluation, and recommended specialized services for residents of privately-operated nursing facilities.  (*Id.* Ex. F (attaching Rule 30(b)(6) Deposition of Larita Paulsen of DSHS) at 77:21-81:13 (stating she is unaware of any such quality assurance activities by DSHS).)

### D. Evidence Concerning Mr. Dunakin's Medical Condition and Disability

According to Dr. Deborah Hill, a licensed psychologist and a member of the team of clinicians who evaluated Mr. Dunakin at Seattle Children's Hospital in 1995 and 1997, Mr. Dunakin's medical history indicates a diagnosis, prior to the age of 21, of muscular dystrophy, specifically fascio-scapulo-humeral muscular dystrophy ("FSHMD") and/or myotonic dystrophy.  (Hill Decl. (Dkt. # 19) ¶¶ 3-5.)  Accordingly, Dr. Hill opines that Mr. Dunakin has "a 'related condition' to intellectual disability as defined in [the federal PASRR regulations]."  (*Id.* ¶ 2; *see also id.* ¶ 3.)

Defendants, however, dispute this assessment.  Dr. Christen A. Kishel, a clinical psychologist who works for DDA, testifies that she does "not see any document . . . that has an original diagnosing physician" indicating a diagnosis of FSHMD.  (Kishel Decl. (Dkt. # 26) ¶ 10 at 4-5.)  Dr. Kishel has little doubt that "Mr. Dunakin does indeed suffer from a congenital neuromuscular disorder as has been presumed by licensed physicians and by Dr. Hill . . . ."  (*Id.* ¶ 12.)  However, Dr. Kishel believes that "without a specific diagnosis from an appropriate first-hand source . . . it is impossible to conclude that Mr. Dunakin's neuromuscular condition 'is known by reputable authorities to cause

1   intellectual and adaptive skills deficits' as required by [Washington State regulations]."[3]

2   (*Id.*)  She opines that "[t]he working diagnosis listed in the children's hospital discharge

3   summary, 'presumptive muscular dystrophy[,]' is too broad to draw specific conclusions

4   with regard to impact on intellectual and adaptive functioning."  (*Id.* ¶ 10 at 5.)

5   Ultimately, Dr. Kishel also disagrees with Dr. Hill's conclusion that Mr. Dunakin has a

6   "related condition" to intellectual disability as defined in [the federal PASRR

7   regulations]."  (*Id.* ¶ 16.)

8       **E.  Mr. Dunakin's Eligibility for DDA State Services and PASRR Reviews**

9           Despite Defendants' present misgivings concerning Mr. Dunakin's diagnosis and

10  the causes of his intellectual disabilities, there is no dispute that they previously

11  determined that he was eligible for state services as a result of limitations in his

12  intellectual and adaptive abilities.  In 1999, Washington's Division of Developmental

13  Disabilities ("DDD"), which is now known as DDA, determined that Mr. Dunakin was

14  eligible for state services based on his diagnosis of muscular dystrophy and limitations in

15  his cognitive and adaptive functioning as assessed in an evaluation called the ICAP.

16  (Kishel Decl. ¶ 4; Hollinger Decl. (Dkt. # 18) ¶ 3; *see also* Hamburger Decl. Ex. J; Hill

17  Decl. ¶ 10; Manion Decl. (Dkt. # 27) ¶ 8.)  Indeed, while Mr. Dunakin lived at home with

18  _____

19          [3] Dr. Kishel opines that "[w]hile state WACs have fairly definitive criteria and
    requirements, federal law, specifically 42 C.F.R. § 435.1010, is much less clear."  (Kishel Decl. ¶
20  13.)  She further states that while PASRR professionals are "currently directed to use the federal
    definition when reviewing an individual for purposes of PASRR[,] . . . they may use some of the
    state definitions, policies and procedures to address concepts that are undefined in federal law."
21  (*Id.* ¶ 14.)  The court discusses Defendants' use of state regulations for PASRR evaluations as
    that usage pertains to the issues presently before the court in the context of its ruling on Mr.
22  Dunakin's motion for partial summary judgment.  *See infra* § III.C.2.

1   his mother, he received Medicaid Personal Care and employment-related services from

2   DDA based on this 1999 assessment of eligibility.  (Hollinger Decl. ¶ 3; *see* Hamburger

3   Decl. Ex. I (attaching Rule 30(b)(6) deposition of DSHS employee Leslie Terpstra) at

4   43:7-44:1, 45:11-19, 46:12-47:9; Ex. J.)

5       Mr. Dunakin lived at home with his mother until he suffered a spinal injury in

6   2005.  (Hollinger Decl. ¶ 2.)  When he was discharged from the hospital in May 2006, he

7   was sent to a Medicaid-certified privately-operated nursing facility.  (*Id.*)  From 2007, to

8   the present, he has been a resident of Everett Care and Rehabilitation Center, which is

9   such a facility.  (*Id.*)

10      Individuals who are residents of nursing facilities may also be clients of DDA.

11  (PSJ Resp. at 6.)  However, because the nursing facility is generally in charge of

12  residents' care, nursing facility residents generally do not receive DDA paid services and

13  accordingly are placed in DDA's "no paid services queue."  (*See* Teed Decl. (Dkt. # 29)

14  Ex. B (attaching Rule 30(b)(6) Hehemann Deposition) at 60:3-25; Hamburger Decl. Ex. I

15  at 44:2-22.)  When Mr. Dunakin entered a nursing facility in 2006, he was placed on

16  DDA's "no paid services queue" because he was no longer receiving paid DDA services.

17  (*See* Hamburger Decl. Ex. I at 44:2-22.)  Nevertheless, Mr. Dunakin continued to be

18  enrolled with DDA and was considered to be a client of DDA for nearly the entire eight

19  years that he has lived in nursing facilities, until June 1, 2014—after the start of this

20  lawsuit.  (Hollinger Decl. ¶ 3.)

21      Mr. Dunakin received a PASRR Level I screen related to his initial admission to a

22  nursing facility on May 31, 2006.  (Hamburger Decl. Ex. G.)  His 2006 PASRR Level I

1  form is undated, but appears on its face to have been sent via facsimile to DSHS on July

2  20, 2006.  (*Id.*)  Mr. Dunakin's PASRR Level I screen indicates that he has documented

3  evidence of a developmental disability and that he has a history of a developmental

4  disability with onset before the age of 22.  (*Id.*)  Significantly, Mr. Dunakin's 2006

5  PASRR Level I screen expressly states that a "Level II Evaluation is required."  (*Id.*)

6  DSHS, however, did not have a copy of Mr. Dunakin's 2006  Level I PASRR screen in

7  its files, and Mr. Dunakin never received a Level II evaluation at that time.  (*See id.* Ex.

8  H at 28-29, 40 (attaching Rule 30(b)(6) Deposition of Scott Watling of DSHS).)

9  　　　　Mr. Dunakin received a second PASRR Level I screen in May 2008, a full year

10  after he was transferred from his initial nursing facility to the Everett Rehabilitation and

11  Care Center.  (*Id.* Ex. M.)  Mr. Dunakin's 2008 PASRR Level I screen directly

12  contradicts his 2006 PASRR Level I screen.  (*Compare id.* Ex. G *with id.* Ex. M.)  Mr.

13  Dunakin's 2008 PASRR Level I screen states that he does not have "documented

14  evidence of a diagnosis of a developmental disability" and he has no "history of a

15  developmental disability" in his past with onset before age 22.  (*Id.* Ex. M.)  This

16  statement would also appear to be contrary to DDD's 1999 determination that Mr.

17  Dunakin was eligible for state services for his developmental disabilities based on his

18  diagnosis of muscular dystrophy and limitations in his cognitive and adaptive

19  functioning.  (*See* Hamburger Decl. Ex. J.)  Further, his 2008 PASRR Level I screen

20  indicates that his condition is so severe that he is unable to participate in specialized

21  services.  (*Id.*)  DDA did not have a copy of this PASRR Level I screen in its files and

22

1    only discovered it in Mr. Dunakin's file at his nursing facility after this lawsuit was filed.

2    (*Id.* Ex. H at 40-41.)

3        In 2014, DDA was aware that Mr. Dunakin was one of its clients who had not

4    received a Level II PASRR evaluation because he appeared on a list or report of DDA

5    clients who were living in nursing facilities.  (Hamburger Decl. Ex. H (Watling Dep.) at

6    64:9-65:7.)  On April 28, 2014, after the present lawsuit was filed, DDA sent Mr. Scott

7    Watling, a regional DSHS PASRR coordinator, to meet with Mr. Dunakin and conduct a

8    PASRR Level II evaluation.  (*Id.* at 12:10, 15:14-18:6; Teed Decl. Ex. F at PROD-

9    000013 ("Scott Watling went out to meet with Adam Dunakin to complete a PASRR

10   2.").)  At approximately the same time, DDA also directed Ms. Leslie Terpstra, a DDA

11   eligibility review worker, to conduct a review of Mr. Dunakin's eligibility for DDA state

12   services.  (*Id.* Ex. I (attaching Rule 30(b)(6) Deposition of Leslie Terpstra of DSHS) at

13   12-13, 16-17.)

14       Although DDA notified Mr. Dunakin's mother of the eligibility review for DDA

15   services (Hollinger Decl. ¶ 4), DDA did not notify Mr. Dunakin's attorneys of either the

16   eligibility review or DDA's contact with Mr. Dunakin for purposes of conducting a

17   PASRR Level II evaluation (Hamburger Decl. ¶ 11; Kas Decl. (Dkt. # 20) ¶ 12).  DDA

18   failed to contact Mr. Dunakin's attorneys despite the fact that DDA was aware of the

19   present lawsuit involving his PASRR eligibility and also aware that Mr. Dunakin was

20   represented by counsel.  (Hamburger Decl. ¶ 11; Kas Decl. ¶ 12.)  DDA also did not

21   inform Mr. Dunakin's mother that it had not notified Mr. Dunakin's attorneys concerning

22

1   its contact with him, and it did not occur to Mr. Dunakin's mother that DDA would not

2   so inform her son's attorneys.[4]   (Hollinger Decl. ¶ 6.)

3   _____

4       [4] Mr. Dunakin's attorneys assert that DDA's failure to contact them prior to Mr.
Watling's contact with Mr. Dunakin was a violation of Rule of Professional Responsibility

5   ("RPC") 4.2, as well as RCW 71A.10.060(1)(a) and 42 C.F.R. § 483.128(c)(2).  (*See* PSJ Mot. at
2, 6 n.3, 7 n.4; Mot. for Cert. at 7 n.1.)  Although Mr. Dunakin's attorneys make this argument,

6   they do not ask the court to take any action or make any rulings with respect to their assertions of
misconduct.  Nevertheless, the parties expend a significant portion of their briefing clashing over

7   this issue.  Indeed, Defendants ask the court to strike the portions of Mr. Dunakin's memoranda
that assert that Mr. Watling's contact with him was improper.  (PSJ Resp. at 15-16.)  Rule 4.2, on

8   its face, applies only to direct communications by lawyers with a represented party.  Mr. Watling
is not an attorney, and therefore, the Rule, strictly applied, would not prohibit his contact with

9   Mr. Dunakin.  *See* RPC 4.2 (generally forbidding an attorney's communication with a person the
attorney knows to be represented by counsel).

10          State law requires, in relevant part, that whenever DSHS is require to give notice, it "shall
give notice to the person with a developmental disability and . . . to at least one other person . . .

11  in the following order of priority: (a) A legal representative of the person with a developmental
disability; (b) A parent or a person with a developmental disability who is eighteen years of age

12  or older; . . . ." RCW 71A.10.060(1)(a).  The federal regulations further require the involvement
a "legal representative" in PASRR evaluations, "if one has been designated under State law."  42

13  C.F.R. § 483.128(c)(2).  DDA was aware of Mr. Dunakin's legal representation at the time of
Mr. Watling's contact.  Defendants' argument that the contact at issue related only to Mr.

14  Dunakin's eligibility for DDA services, which "is not within the scope of this case or the scope
of representation" is disingenuous as best.  (*See* PSJ Resp. at 16.)  First, Mr. Watling testified

15  that his purpose in contacting Mr. Dunakin was to perform a Level II PASRR evaluation.
(Hamburger Decl. Ex. H at 12:10, 15:14-18:6; *see also* Teed Decl. Ex. F at PROD-000013.)

16  Second, Defendants have made Mr. Dunakins' eligibility for DDA services an issue in this case
by conflating the eligibility requirements for state services with the PASRR process.  (*See infra*
§§ II.F, III.C.2.)

17          Defendants, however, also assert that they were entitled to provide notice only to Mr.
Dunakin's mother in this instance and not to his counsel because Mr. Dunakin signed an

18  "Authorization To Use or Disclose Protected Health Information" form listing "self" as his
"Legal Representative Name."  (*See* Teed Decl. Ex. E.)  Mr. Duankin's attorneys respond that

19  the form is suspect because it was Mr. Watling who filled out the form for Mr. Dunakin's
signature.  (PSJ Reply (Dkt. # 34) at 11-12.)  However, it is unclear from the evidence cited

20  whether Mr. Watling or someone from Mr. Dunakin's nursing facility actually filled out the
form.  (*See* 2d Hambureger Decl. (Dkt. # 37) Ex. P (attaching excerpts of Mr. Watling's Rule

21  30(b)(6) deposition) at 47:12-20.)  In any event, the court concludes that it has insufficient
information to make any determination regarding whether Mr. Dunakin's signature on the form

22  represented a knowing and voluntary relinquishment of his right to have his counsel notified
under RCW 71A.10.060(1)(a) or whether the form otherwise meets the requirements for waiving
notice to counsel under RCW 71A.10.060(3).  However, because Mr. Dunakin and his counsel

1    When Mr. Watling reviewed Mr. Dunakin's file at the nursing facility, he

2    discovered the May 2008 PASRR Level I screen.  (Hamburger Decl. Ex. H at 31:13-21;

3    Ex. M.)  Once Mr. Watling discovered this, he halted his evaluation of Mr. Dunakin and

4    did not perform a Level II PASRR evaluation.  (*Id.* Ex. H at 57:5-10; 61:22-25; Teed

5    Decl. Ex. D at 31:13-32:3.)   Instead, Mr. Watling decided to wait for an "eligibility

6    review" by Ms. Terpstra to determine if Mr. Dunakin met DDA's eligibility criteria for

7    state services.  (Hamburger Decl. Ex. H at 57:5-10, 60:21-61:25.)  Mr. Watling

8    communicated his impression that Mr. Dunakin did not have a developmental disability

9    that would meet DDA's criteria to Ms. Terpstra.  (*Id.* Ex. I at 19:17-22.)

10    Ms. Terpstra conducted Mr. Dunakin's DDA eligibility review by applying the

11    same process and eligibility criteria that are applied to all individuals whose DDA

12    eligibility is being assessed or reviewed.  (*Id.* Ex. I at 91:21-93:12.)  Ms. Terpstra

13    conducted a review of Mr. Dunakin's file and spoke with Mr. Watling about Mr.

14    Dunakin's nursing home records.  (*Id.* at 18-22.)  Based solely on a full-scale intelligence

15    quotient ("FSIQ") score of 83 from 1997 that was in Mr. Dunakin's files, Ms. Terpstra

16    determined that Mr. Dunakin was not eligible for DDA services.  (*Id.* at 70:3-10.)

17    Although Ms. Terpstra concluded that Mr. Dunakin did not qualify for DDA

18    services, she did not separately evaluate whether he was eligible for federal PASRR

19

20    do not request that the court take any specific action with respect to Mr. Watling's contact with
Mr. Dunakin, the court need not decide this issue here.  On the other hand, the court also declines

21    to "strike" this portion of Mr. Dunakin's memoranda as requested by Defendants.  Defendants'
mere disagreement with Mr. Dunakin's attorneys concerning the import of Mr. Watling's contact

22    with Mr. Dunakin without notice to counsel is not a proper basis for striking portions of Mr.
Dunakin's memoranda.

ORDER- 15

1    services.  (*Id.* at 85:21-25.)  Based on the determination that Mr. Dunakin's 1998 FSIQ

2    score exceeded the intelligence quotient cut-off for DDA eligibility, everyone at DDA

3    assumed that Mr. Dunakin was also ineligible for services under PASRR.  (*See id.* Ex. E

4    at 153:11-154:14 ("[W]e [DDA] believe that our state law matches federal law other than

5    the one age portion with related condition.  So if our intake eligibility people decided

6    [Mr. Dunakin] was not eligible, we believe that would meet the federal definition as

7    well."); Ex. H at 87:12-88:3; *see also id* Ex. H at 83:6-19; Teed Decl. Ex. F at

8    PROD_000013 ("Adam was reviewed by our Intake and Eligibility Unit and found

9    ineligible for DDA services.  At this point, we have no services to offer and Adam does

10   not qualify for a PASRR 2 review.").)

11   **F.  Washington State's Recent PASRR Enhancements**

12          In a declaration dated November 10, 2014, Ms. Terry Hehehman, DDA's PASRR

13   Program Manager, testifies that as a result of CMS's investigation into DDA's PASRR

14   practices at Lakeland Village, DDA began working closely with CMS in approximately

15   January 2014, and has made changes to DDA's PASRR process statewide.  (*See*

16   Hehemann Decl. ¶ 5.)  Ms. Hehemann testifies that DDA began expanding its enhanced

17   PASRR process to privately-operated Medicaid-certified nursing facilities in

18   approximately April 2014,[5] with a target for completing that process by November 30,

19   2014.  (*Id.*)  She further testifies in her declaration that over 270 individuals in privately-

20   operated Medicaid-certified nursing facilities have been reassessed for PASRR purposes

21   

22          [5]Mr. Dunakin filed the present lawsuit on April 16, 2014.  (*See* Compl.)

ORDER- 16

1  since April 2014, representing ninety percent (90%) of those who DDA initially

2  contemplated might need review.  (*Id.* ¶ 6.)  Ms. Hehemann testifies that this means that a

3  DDA worker has reviewed a nursing facility resident's medical records for completion of

4  a PASRR Level I screening form, completed this step if necessary, and completed a

5  PASRR Level II evaluation where required pursuant to a PASRR Level I screening form.

6  (*Id.*)

7        In their November 10, 2014, responsive memorandum, Defendants admit,

8  consistent with Mr. Dunakin's position, that developmental disability eligibility

9  determinations under state law and PASRR determinations under federal law are subject

10  to different standards.  (*See* PSJ Resp. at 1.)  Although Defendants admit that "[f]or a

11  brief period of time, the state eligibility definition was being used to implement PASRR,"

12  they now contend that they no longer apply the same standard to the two determinations.

13  (*Id.* at 7 (citing Hehemann Decl. ¶ 8).)  Indeed, in her November 10, 2014, declaration,

14  Ms. Hehemann testifies as follows:

15        The State has consistently trained and used the federal age requirements to
        implement PASRR.  The State PASRR program recognizes there is a
16        difference between the federal definition of intellectual disability used for
        PASRR and state eligibility requirements for purposes of DDA services or
17        benefits.  Then, for a brief period of time, the state eligibility definition,
        with the exception of age of onset, was being used to implement PASRR,
18        but that has since changed so that *only the federal definition is being used.*
        Using the federal standard is reinforced through constant program
19        improvements, including the forms that are currently being utilized and
        training to DDA staff and community members.
20
    (Hehemann Decl. ¶ 8 (italics added).)
21

22

1    Despite Ms. Hehemann's reassurance "that only the federal definition is being

2   used" presently to determine PASRR eligibility for those with intellectual disabilities or

3   related conditions, the revised PASRR Level II form she attaches to her declaration

4   indicates otherwise.  (*See id.* Ex. B at 3.)  The PASRR Level II form that DDA recently

5   re-designed to "enhance and refine the implementation of PASRR" continues to instruct

6   DDA personnel  to make determinations of "intellectual disability" or "related condition"

7   using the State's criteria found in the Washington Administrative Code.  (*Id.*)

8   Specifically, the form for PASRR Level II evaluations states:

9        *Note:  the determination of intellectual disability for PASRR purposes uses
         the state criteria under WAC 388-823-0200 through 230.  The*
10       *determination of "related condition",* [sic] *uses the state criteria for*
         *cerebral palsy, epilepsy, autism, another neurological condition or other*
11       *condition similar to intellectual disability in WAC 388-823-0300 through*
         *0940, with the exception that the age of origination of the condition is*
12       *under 22 (not under 18).*

13   (*Id.*)  This form is dated July 14, 2014—more than four months after Defendants began

14   expanding their enhanced PASRR process to privately-operated Medicaid-certified

15   nursing facilities.  (*Id.* ¶ 5; *id.* Ex. B.)

16    In addition to the foregoing, Mr. Dunakin points to additional evidence indicating

17   that, despite Ms. Hehemann's assurances to the contrary, Defendants continued to utilize

18   the state DDA eligibility requirements for PASRR screening and evaluations long after

19   they began to apply their "enhanced PASRR process" to residents in privately-operated

20   Medicaid-certified nursing facilities.  For example, according to Ms. Hehemann's

21   September 15, 2014, Rule 30(b)(6) deposition testimony, DDA was still utilizing, as of

22

1    that date, the  state standard for its PASRR reassessments that Defendants now

2    acknowledge was incorrect:

3        Q:  So do you believe this definition of intellectual disability came from the
         PTAC website?
4
5        A:  No.  It's what we developed using our WAC and federal rule.  And we
         believe that our WAC mirrors what the federal rule says is an intellectual
6        disability.  The only place we differ is in the related condition piece
         because, the federal rule, it says if the onset is before age [22] and our state
         rule says before age 18.
7                So there is that segment of the population or people in that age group
         whose condition originated after 18, before [22].  Those people don't meet
8        our state definition.  But we would still do PASRR Level I with them
         because we're required by federal rule because they have that difference in
9        the rule.

10    (See Hamburger Decl. Ex. E at 82:16-83:1, 83:24; see also id. at 140:10-15 ("So then we

11   explain that the federal and the state definitions are the same except for that age period

12   for related condition, that ours is they have to have – the condition needs to have started

13   before they were 18 and the federal definition says before they were 22."); id. at 154:5-9

14   ("[W]e believe that our state law matches federal law other than the one age portion with

15   related condition.  So if our intake eligibility people decided [Mr. Dunakin] was not

16   eligible, we believe that would meet the federal definition as well.").)  Thus, as of at least

17   September 15, 2014, DDA was still operating on the understanding that the only

18   difference between DDA's eligibility standard for state services and the federal PASRR

19   standard was the age of onset.   Yet, as of November 10, 2014, Defendants acknowledge

20   that utilizing the state standard for PASRR evaluations was error.  (See PSJ Resp. at 1, 7.)

21          Further, like Ms. Hehemann, Mr. Watling, the regional DSHS PASRR coordinator

22   who was sent to evaluate Mr. Dunakin's PASRR eligibility on April 28, 2014, also

ORDER- 19

understood that the only difference between the federal and state definitions was the age of onset.  During his September 12, 2014, Rule 30(b)(6) deposition, Mr. Watling engaged in the following colloguy:

> Q:  . . . Is there any formal assessment that you're aware of for determining whether someone is eligible under the federal definition who's not eligible under the state definition?
>
> **********
>
> A:  Under my awareness, the federal definition is different in age of onset, that the state definition goes to the onset age of 18 and the federal definition goes to 21.  So with supportive eligibility, in terms of determining whether this would have been an issue that would qualify for developmental disabilities, then the next question is age of onset.  And that's what makes the determination.
>
> Q: . . . Are there any other factors that would make a determination?
>
> **********
>
> A:  Not under my understanding.

(Hamburger Decl. Ex. H at 87:12-88:3.)

Indeed, the form instructions to DDA staff concerning the federal PASRR standards (that Ms. Hehemann attaches to her declaration to demonstrate that DDA no longer utilizes the state eligibility standard for PASRR purposes) is dated October 31, 2014—long after DDA began expanding its enhanced PASRR process to privately-operated Medicaid-certified nursing facilities in approximately April 2014, and only one month prior to DDA's target completion date for that upgrade.  (Hehemann Decl. ¶ 5, Ex. C.)  Thus, undisputed evidence indicates that for the majority of the time that DDA was expanding its revised PASRR process to privately-operated nursing facilities (from approximately April 2014 to DDA's target completion date of November 30, 2014),

1   DDA was still applying a standard to its PASRR reassessments that it now acknowledges

2   was in error.

3          The court now considers the parties' presently pending motions.

## III.     ANALYSIS

### A. Defendants' Rule 12(c) Motion

6          The court considers Defendants' Federal Rule of Civil Procedure 12(c) motion for

7   dismissal on the pleadings first because if the court were to conclude that dismissal is

8   appropriate, there would be no need for the court to consider any of the remaining

9   motions.  In this instance, however, the court determines that dismissal is appropriate

10  only with respect to one part of Mr. Dunakin's claim under Title XIX of the Social

11  Security Act.  Although the court grants Defendants' motion to dismiss with respect to a

12  portion of that claim, the court also grants Mr. Dunakin leave to amend his complaint.

### 1.  Standards for Review of Defendants' Rule 12(c) Motion

14         Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on

15  the pleadings after the pleadings are closed.  Judgment on the pleadings "is properly

16  granted when, taking all the allegations in the pleadings as true, a party is entitled to

17  judgment as a matter of law." *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th

18  Cir. 2011).  The same standard governs a Rule 12(c) motion for dismissal as governs a

19  Rule 12(b)(6) motion. *Dworkin v. Hustler Magazine Inc.,* 867 F.2d 1188, 1192 (9th Cir.

20  1989).  Specifically, to avoid dismissal, "a complaint must contain sufficient factual

21  matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

22  *Iqbal*, 557 U.S. 662, 678 (2009).  Dismissal for failure to state a claim "is proper if there

1   is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a

2   cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir.

3   2011).  In ruling on a motion to dismiss, a court may consider the pleadings, documents

4   attached to the pleadings, and documents incorporated by reference in the pleadings.

5   *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citing *Van Buskirk v. CNN*,

6   284 F.3d 977, 980 (9th Cir. 2002)).  The court has considered only these materials in

7   ruling on Defendants' Rule 12(c) motion for dismissal on the pleadings.

8   **2.  Claim One – Alleged Violations of PASRR Guidelines under the NHRA**

9        Mr. Dunakin brings his claim for violations of the NHRA and its accompanying

10   federal PASRR regulations under 42 U.S.C § 1983.  Defendants argue that this claim

11   must be dismissed because a violation of PASRR regulations is not a cognizable claim

12   under 42 U.S.C § 1983.  (Rule 12(c) Mot. at 8-14.)  For the reasons stated below, the

13   court disagrees.

14        Section 1983 imposes liability on anyone who, under color of state law, deprives a

15   person "of any rights, privileges, or immunities secured by the Constitution and laws."

16   42 U.S.C. § 1983; *see also Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  "[W]*hether*

17   *Congress intended to create a federal right*" is the touchstone for determining whether a

18   statutory violation may be enforced through 42 U.S.C. § 1983.  *Gonzaga Univ. v. Doe*,

19   536 U.S. 273, 283 (2002) (italics in original).  In *Blessing*, the Supreme Court identified

20   three issues to consider when deciding whether a particular statutory provision gives rise

21   to a federal right:  (1) whether Congress intended for the provision in question to benefit

22   the plaintiff;  (2) whether the plaintiff has demonstrated that the right protected by the

ORDER- 22

1  statute is not so vague and amorphous that its enforcement would strain judicial

2  competence; and  (3) whether the statute unambiguously imposes a binding obligation on

3  the States.  520 U.S. at 340-41.  The court must analyze these issues with reference to the

4  specific right at issue and not to the statute as a whole.  *See id.* at 342.

5      In *Gonzaga*, the Supreme Court clarified the first prong of the *Blessing* test by

6  rejecting the notion that a plaintiff could enforce a statute "so long as the plaintiff [fell]

7  within the general zone of interest that the statute [was] intended to protect."  536 U.S. at

8  283.  Instead, the *Gonzaga* court insisted that "it is *rights*, not the broader or vaguer

9  'benefits' or 'interests,' that may be enforced under the authority of [42 U.S.C. § 1983]."

10  *Id.* (italics in original).  To create a privately enforceable right, a statute must be "phrased

11  in terms of the person benefited," rather than "focus on the person regulated."  *Id.* at 284,

12  287.  However, once a plaintiff "demonstrates that a statute confers an individual right,

13  the right is presumptively enforceable by § 1983."  *Id.* at 284.

14      Defendants assert that the statutory provision of the NHRA that contains the

15  PASRR guidelines, specifically 42 U.S.C. § 1396r(e)(7), fails the first *Blessing* factor as

16  clarified by the Supreme Court in *Gonzaga*.  (Rule 12(c) Mot. at 8-14.)  Defendants do

17  not challenge the remaining two *Blessing* factors.  (Rule 12(c) Reply (Dkt. # 42) at 4 ("It

18  is only the first prong of . . . [the *Blessing*] test, whether Congress intended to create

19  enforceable rights, that is at issue in this case.").)  Thus, the court's analysis is limited to

20  the first factor.

21      In *Joseph S. v. Hogan*, 561 F. Supp. 2d 280 (E.D.N.Y. 2008), advocacy groups

22  and mentally disabled individuals brought an action alleging that the state's mental health

1    system had the effect of warehousing individuals with mental illness in highly restrictive

2    nursing homes, in violation of the NHRA and the PASRR provisions found in 42 U.S.C.

3    § 1396r(e)(7).  The *Joseph S.* court considered the same issue presented here:  whether

4    the PASRR provisions of the NHRA confer individual rights upon the plaintiffs and meet

5    the first *Blessing* prong in light of the refinements to that prong articulated by the

6    Supreme Court in *Gonzaga*.  *Joseph S.*, 561 F. Supp. 2d at 300.  The court concluded that

7    the PASRR provisions do confer such individual rights.  *Id.*  "Unlike the statutes in

8    *Gonzaga* and *Blessing*, §§ 1396r(e)(7)(A) and (B) are directly concerned with 'whether

9    the needs of any particular person have been satisfied.'"  *Joseph S.*, 561 F. Supp. 2d at

10   300 (citing *Blessing*, 520 U.S. at 343, *as quoted in Gonzaga*, 536 U.S. at 288).  The court

11   finds the analysis of the *Joseph S.* court to be comprehensive in its consideration of the

12   first *Blessing* factor as refined by *Gonzaga* and to be persuasive as well as more fully

13   discussed below.

14         Rights-creating language "confer[s] a right directly on a class of persons that

15   include[s] the plaintiff in the case" rather than "for the benefit of the public at large."

16   *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979), *cited with approval in*

17   *Gonzaga*, 536 U.S. at 284 n.3.  The provisions in the NHRA requiring a preadmission

18   screening program include specific language referring to the persons benefitted:  "[T]he

19   state must have in effect a preadmission screening program, for making

20   determinations . . . described in subsection (b)(3)(F) of this section for . . . mentally

21   retarded individuals . . . who are admitted to nursing facilities . . . ."  42 U.S.C.

22   § 1396r(e)(7)(A)(i).  Subsection 1396r(b)(3)(F)(ii) of Title 42 states, in turn, that the State

must determine "prior to admission that, because of the physical and mental condition of

the individual, the individual requires the level of services provided by the nursing

facility, and, if the individual requires such level services, whether the individual requires

specialized services for mental retardation."  42 U.S.C. § 1396r(b)(3)(F)(ii).  The

language in the provision requiring resident reviews also uses language that is even more

clearly "rights-creating":

> [I]n the case of each resident of a nursing facility who is mentally retarded,
> the State . . . must review and determine . . . whether or not the resident,
> because of the resident's physical and mental condition, requires the level
> of services provided by a nursing facility or requires the level of services of
> an intermediate case facility . . . and whether or not the resident requires
> specialized services for mental retardation.

42 U.S.C. §§ 1396r(e)(7)(B)(ii)(I), (II).  Although these provisions are phrased in terms

of the responsibilities imposed upon the State, their purpose is to protect the rights of

individuals.

In addition to the foregoing provisions, the PASRR requirements to offer

specialized services, alternative placement, and notice of PASRR determinations also

focus on the rights of individual residents who are beneficiaries of these services.  *See* 42

U.S.C. § 1396r(e)(7)(C).  Like the PASRR evaluation sections quoted above, these

provisions also begin with a mandatory command:  "[T]he State must meet the following

requirements. . . ."  *Id.*  The provision mandates:

> In the case of a resident who is determined . . . to require specialized
> services for . . . mental retardation, . . . the State must, in consultation with
> the resident's family or legal representative and care-givers--
>
> (I) inform the resident of the institutional and noninstitutional alternatives
> covered under the State plan for the resident,

1

2      (II) offer the resident the choice of remaining in the facility or of receiving
       covered services in an alternative appropriate institutional or
3      noninstitutional setting, [and] . . .

4      (IV) . . . provide for (or arrange for the provision of) such specialized
       services for the . . . mental retardation.

5      42 U.S.C. §§ 1396r(e)(7)(C)(i)(I), (II), (IV).

6             Unlike the statutory provisions at issue in *Gonzaga*, which the Supreme Court

7      found to be "two steps removed from the interests of [the individual plaintiffs], *Gonzaga*,

8      536 U.S. at 287, the PASRR provisions above directly impact individual nursing home

9      residents because they determine whether the resident will be placed in a nursing facility

10     and what services the individual will receive.  Thus, 42 U.S.C. § 1396r(e)(7) places "an

11     unmistakeable focus on the benefited class," which here is individuals with mental

12     disabilities who have been or will be placed in nursing facilities.  *See Gonzaga*, 536 U.S.

13     at 284.  The PASRR provisions' mandate of individualized determinations, *see* 42 U.S.C.

14     §§ 1396r(e)(7)(A), (e)(7)(B), (b)(3)(F)(ii), indicates that Congress intended to create "an

15     individual entitlement to services," *see Gonzaga*, 536 U.S. at 281, that would "give rise

16     to individual rights," *id.* at 288.

17            Further, despite Defendants' arguments to the contrary (*see* Rule 12(c) Reply at 5-

18     6), Ninth Circuit precedent indicates that the fact that the statute is phrased in terms of

19     requirements for a state plan does not foreclose a finding that the statute also gives rise to

20     individual rights.  In *Watson v. Weeks*, 436 F.3d 1152 (9th Cir. 2006), the Ninth Circuit

21     held that the language in the Medicaid Act, 42 U.S.C. § 1396a(a)(10), which states that

22     "[a] State plan for medical assistance must . . . provide . . . for making medical assistance

1    available . . . to . . . all [eligible] individuals" creates a right enforceable under 42 U.S.C.

2    § 1983. *Watson*, 436 F.3d at 1160. Specifically, the Ninth Circuit held that this type of

3    statutory language has the same individual rights focus as the "[n]o person shall . . . be

4    subjected to discrimination" language that the Supreme Court in *Gonzaga*, 536 U.S. at

5    284, concluded was explicitly rights-creating. *Watson*, 436 F.3d at 1160 ("This language

6    is unmistakably focused on the specific individuals benefited . . . ."); *see also Sabree ex*

7    *rel. Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004); *S.D. ex rel Dickson v. Hood*,

8    391 F.3d 581, 603 (5th Cir. 2004).

9        Defendants are correct that the NHRA is a spending statute and that such statutes

10    generally do not create enforceable rights. *Gonzaga*, 536 U.S. at 280-81. The typical

11    remedy for state noncompliance with federally imposed conditions in a spending statute

12    is not a private cause of action for noncompliance but rather action by the federal

13    government to terminate funds to the state. *Ball v. Rodgers*, 492 F.3d 1094, 1103-04 (9th

14    Cir. 2007). However, such statutes may create rights enforceable under § 1983 when

15    "Congress speaks with a clear voice and manifests an unambiguous intent to confer

16    individual rights." *Id.* at 1104 (quoting *Gonzaga*, 536 U.S. at 280) (internal quotations

17    and alterations omitted). In addition, when the remedial devices specified in the statute

18    are sufficiently comprehensive, those devices may suffice to demonstrate Congressional

19    intent to preclude the remedy of suits under § 1983.[6] *Id.*

20

21    _____

22        [6] Section 1396r(f) of Title 42 provides that "[i]t is the duty and responsibility of the
Secretary to assure that requirements which govern the provision of care in nursing facilities . . . ,
and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and

1    In *Ball*, the Ninth Circuit concluded that Congress intended to create individual

2  rights enforceable via § 1983 in the free choice provisions of the Medicaid Act, 42 U.S.C.

3  § 1396n(c)(2)(C) and § 1396n(d)(2)(C), based on the provision's repeated use of the

4  word "individuals."  The court concluded that the use of this term in conjunction with

5  language describing the right to be informed and the right to choose among alternatives

6  indicated that the statutory provisions were "'concerned with whether the needs of any

7  particular person have been satisfied,' and not solely with an aggregate 'institutional

8  policy and practice.'"  *Ball*, 492 F.3d at 1107 (quoting *Gonzaga*, 536 U.S. at 288).

9  "While express use of the term 'individuals' (or 'persons' or similar terms) is not

10 essential to finding a right for § 1983 purposes, usually such use is sufficient for that

11 purpose."  *Id.* at 1108.  Thus, the same analysis that the Ninth Circuit utilized in *Ball*

12 would apply to the PASRR provisions of the NHRA at issue here, which specifically and

13 repeatedly refer to "residents" of a nursing facility or "individuals" who are "mentally

14 retarded."  *See* 42 U.S.C. §§ 1396r(e)(7)(A)(i); 1396r(b)(3)(F)(ii); 1396r(e)(7)(B)(ii)(I), (II);

15 1396r(e)(7)(C)(i)(I), (II), (IV).  *See also Joseph S.*, 561 F. Supp. 2d at 305 ("[T]he

16 NHRA's denial of payment is based on improper *individual* determinations and is thus

17 distinguishable from a denial of funding under FERPA, the statue at issue in *Gonzaga*,

18

19 rights of residents and to promote the effective and efficient use of public moneys."  42 U.S.C. §
   1396r(f).  Defendants assert that this provision "explicitly designates the secretary as the
20 individual with 'the duty and responsibility' to enforce" requirements related to nursing
   facilities, and therefore it "forecloses private enforcement." (Rule 12(c) Reply at 7.)  The court
   does not find that this single sentence in the statute represents the kind of "comprehensive"
21 "remedial device" that would demonstrate a Congressional intent to preclude enforcement
   pursuant to a private suit under § 1983.  *See Joseph S.*, 561 F. Supp. 2d at 304 ("[F]ederal
   oversight of a state's compliance with NHRA . . . ha[s] been held to be insufficient to preclude a
22 1983 action.").

which is triggered by a prohibited *policy or practice*.") (italics in original).  Based on the

foregoing analysis, the court denies Defendants' motion to dismiss Mr. Dunakin's § 1983

claim under the PASRR provisions of the NHRA.

   **3.   Claims 2 and 3 – Alleged Violations of the ADA and Section 504 of the Rehabilitation Act**

   Generally, the ADA and Section 504 of the Rehabilitation Act prohibit

discrimination against individuals with disabilities.  There is no significant difference in

the analysis of rights and obligations created by Title II of the ADA and Section 504 of

the Rehabilitation Act,[7] and therefore ordinarily they may be interpreted and applied

together.  *See, e*.g., *McGary v. City of Portland*, 386 F.3d 1259, 1265 n.7 (9th Cir. 2004);

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001).  Defendants argue that

Mr. Dunakin's complaint fails to state a claim under either statute.  (Rule 12(c) Mot. at

14-16.)

   Federal regulations implementing both the ADA and Section 504 have specific

provisions referred to as "integration" regulations or mandates, which require public

entities to treat individuals with disabilities in the "most integrated setting appropriate to

the[ir] needs."  28 C.F.R. §§ 35.130(d), 41.51(d).  In *Olmstead v. L.C. ex rel. Zimring*,

527 U.S. 581 (1999), the Supreme Court held that these integration mandates require a

state to provide services to individuals in community settings rather than institutions

---

   [7] Unlike Title II of the ADA, Section 504 of the Rehabilitation Act requires a plaintiff to allege that the program at issue receives federal financial assistance.  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135. (9th Cir. 2001).  Here, Mr. Dunakin alleges this element of his Section 504 claim.  (Compl. ¶ 41.)

1   whenever the relevant professionals conclude that the services required by the individual

2   may appropriately be rendered in a community setting, unless the expense involved

3   would fundamentally alter the state's overall services and programs.  *Id.* at 607.

4       In *Olmstead*, the Supreme Court considered the scope of the ADA's integration

5   mandate:  "Specifically, we confront the question of whether the proscription of

6   discrimination [in Title II of the ADA] may require placement of persons with mental

7   disabilities in community settings rather than in institutions.  The answer, we hold, is a

8   qualified yes."  *Id.* at 587.  The Court held that "[u]njustified isolation . . . is properly

9   regarded as discrimination based on disability."  *Id.* at 597.  Thus, unnecessary

10   segregation of persons with mental disabilities is discrimination *per se* under either the

11   ADA or Section 504 of the Rehabilitation Act.  *See id.*; *see also Joseph S.*, 561 F. Supp.

12   2d at 290.  The state is to provide community-based treatment for persons with mental

13   disabilities when such placement is appropriate, so long as "the affected person does not

14   oppose such treatment, and the placement can be reasonably accommodated, taking into

15   account the resources available to the State and the needs of others with mental

16   disabilities."  *Olmstead*, 527 U.S. at 607.[8]

17

---

18       [8] In *Olmstead*, the Supreme Court stated that "under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities *when the*

19   *State's treatment professionals determine that such placement is appropriate* . . . ."  527 U.S. at 607 (italics added).  Here, however, Mr. Dunakin alleges that he has been denied the evaluation

20   necessary to determine whether such placement is appropriate.  (*See* Compl. ¶¶ 16, 29-31, 36-39, 42.)  The language in *Olmstead* concerning determinations by the state's treatment professionals,

21   527 U.S. at 587, 607, appears to be based on the particular facts at hand and not fundamental to the Court's holding.  *See Joseph S.*, 561 F. Supp. 2d at 291.  Thus, the fact that Mr. Dunakin's

22   complaint does not allege that a State treatment professional has made such a determination does not render his complaint insufficient.

1        In *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003), the Ninth Circuit applied

2   the *Olmstead* decision to individuals at risk of being confined to nursing facilities who,

3   with long-term care services, could live in alternative community-based settings.  The

4   Ninth Circuit stated that to prove that a public service or program violates Title II of the

5   ADA, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he

6   was either excluded from participation in or denied the benefits of a public entity's

7   services, programs, or activities or was otherwise discriminated against by the public

8   entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his

9   disability.[9]  328 F.3d at 516.  Plaintiff Townsend sought access to appropriate

10  community-based, long-term care service in lieu of nursing facility placement.  *Id.* at 514.

11  The Ninth Circuit held that Washington State violated Title II of the ADA when it failed

12  to provide long-term care services to the plaintiff and other class members in community

13  settings unless the state could demonstrate that providing the services would

14  fundamentally alter its Medicaid programs.[10]  *Id.* at 518.

15        Here, Mr. Dunakin alleges that he is a qualified individual with a disability.

16  (Compl. ¶¶ 5, 16, 28.)  He alleges that he is eligible for a PASRR Level II evaluation,

18    [9] As noted above, there is no significant difference between the elements that a plaintiff
19  must allege with respect to a claim under the ADA and a claim under Section 504 of the
    Rehabilitation Act.  A plaintiff bringing suit under Section 504 of the Rehabilitation Act must
    show that (1) he is an individual with a disability; (2) he is otherwise qualified to receive the
20  benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4)
    the program receives federal financial assistance.  *Duvall*, 260 F.3d at 1135.  Indeed, Title II of
21  the ADA was expressly modeled after Section 504 of the Rehabilitation Act.  *Id.*

22    [10] The Ninth Circuit remanded to the district court for development of the factual record
    related to this defense.  *Townsend*, 328 F.3d at 520.

1   specialized services, and alternative community placement, but has been inhibited from

2   accessing such services because Defendants have failed to conduct the required

3   evaluation that would make such alternative community-based placement options and

4   services available to him.  (*Id.* ¶¶ 16, 29-31, 36-39, 42.)  Mr. Dunakin pleads that he

5   would like to receive his long-term care services in a less restrictive community-based

6   setting.  (*Id.* ¶ 32.)  He also pleads that, because Defendants have failed to conduct a

7   PASRR Level II evaluation, he has been denied non-institutional care or services that

8   could lead to discharge, resulting in discrimination against him on the basis of his

9   disability.  (*Id.* ¶¶ 35-42.)  Finally, he pleads the specific services, programs, or activities

10   at issue.  Specifically, he alleges that he seeks a PASRR evaluation, PASRR specialized

11   services, notice pursuant to PASRR about the state's determination and information about

12   available alternative community-based placements, and appropriate less restrictive

13   placement.  (Compl. ¶ 32, § VIII, ¶ 3.)

14         These allegations are sufficient to state claims under both the ADA and Section

15   504 of the Rehabilitation Act.  *See Joseph S.*, 561 F. Supp. 2d at 292 (rejecting similar

16   arguments by state defendants in that case); *see also Day v. Dist. of Columbia.*, 894 F.

17   Supp. 2d 1, 22-23 (D.D.C. 2012) (holding that, to state a claim under the ADA or Section

18   504 of the Rehabilitation Act, it was sufficient to allege that the District provided the

19   existing system through which the plaintiffs received long-term care services and, in so

20   doing, had utilized criteria that had caused the plaintiffs to be confined unnecessarily in

21   order to obtain long-term care services, rather than facilitate their transition to the

22   community with appropriate services and supports); *State Office of Protection &*

1  *Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 276 (D.

2  Conn. 2010).  Accordingly, the court denies Defendants' motion to dismiss Mr.

3  Dunakin's claims based on the ADA or Section 504 of the Rehabilitation Act.

4      **4.  Claim 4 – Alleged Violations of Title XIX of the Social Security Act**

5      Mr. Dunakin pleads four claims under Title XIX of the Social Security Act.

6  (Compl. ¶ 44.)  He pleads that Defendants violated the Act by failing to provide Medicaid

7  benefits (1) with reasonable promptness; (2) in compliance with Medicaid comparability

8  requirements; (3) with a meaningful choice of providers, including a choice between

9  institutional and community based services; and (4) with adequate written notice of

10  Defendants' determinations, as well as the right to appeal to Defendants' administrative

11  hearing process.  (*Id.*)  Defendants argue that these claims must be dismissed.  (Rule

12  12(c) Mot. at 16-21.)

13      **a.  Reasonable Promptness**

14      Defendants assert that the Social Security Act requires only that they promptly pay

15  for Medicaid-covered services, and not that they arrange for or provide for such services.

16  (*Id.* at 16-18.)  Mr. Dunakin's claim for the provision of Medicaid benefits with

17  reasonable promptness is based in part on 42 U.S.C. § 1396a(a)(8).  (Compl. ¶ 44.)  That

18  provision of the Medicaid Act requires that "[a] State plan for medical assistance must . .

19  . provide that all individuals wishing to make application for medical assistance under the

20  plan shall have an opportunity to do so, and that such assistance shall be furnished with

21  reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).  Defendants

22  argue that Mr. Dunakin fails to state a claim under this provision because the Medicaid

ORDER- 33

1    Act defines "medical assistance" as payment of part or all of the cost of services.  (*See*

2    Rule 12(c) Mot. at 16-17 (quoting 42 U.S.C. § 1396d(a) (2009)).)  Defendants argue that

3    the statute relates to the promptness of payment for services and not the actual provision

4    of services, such as a PASRR evaluation, by the state.  (*See id.*)  Defendants assert that

5    because Mr. Dunakin does not allege that the state refused to pay for services, his claim

6    based on Defendants' alleged failure to provide Medicaid benefits with reasonable

7    promptness under 42 U.S.C. § 1396a(a)(8) should be dismissed.

8          Defendants argument, however, appears to be based on an outdated version of 42

9    U.S.C. § 1396d(a).  Until recently, the Medicaid Act defined "medical assistance" as

10   "payment of part or all of the cost of" services.  *Leonard v. Mackereth*, No. 11-7418,

11   2014 WL 512456, at *5 (E.D. Pa. Feb. 10, 2014) (quoting 42 U.S.C. § 1396d(a) (2009)).

12   Based on that definition, some federal courts held that a state's obligation was limited to

13   providing financial assistance only.  *Id.*  This is the argument that Defendants have

14   adopted here.  (Rule 12(c) Mot. at 16-17.)  As part of the Patient Protection and

15   Affordable Care Act, however, Congress amended the definition of "medical assistance"

16   under 42 U.S.C. § 1396d(a).  As of March 23, 2010, "[t]he term 'medical assistance'

17   means payment of part or all of the cost of . . . care and services *or the care and services*

18   *themselves or both[.]*"  42 U.S.C. § 1396d(a)(italics added).  As one court has noted, it

19   appears that Congress intended "to clarify that where the Medicaid Act refers to the

20   provision of services, a participating State is required to provide (or ensure the provision

21   of) services, not merely to pay for them."  *John B. v. Emkes*, 852 F. Supp. 2d 944, 951

22   (M.D. Tenn. 2012); *see also Disability Rights N.J., Inc. v. Velez*, No. Civ.A.05-4723,

1   2010 WL 50555820 (D.N.J. Dec. 2, 2010) (reversing prior order granting summary

2   judgment to the defendants and reinstating the plaintiff's claim because subsequently

3   amended definition of "medical assistance" in 42 U.S.C. § 1396d(a) included not only

4   financial assistance but also actual care and services).

5          Following Mr. Dunakin's reference to and analysis of the amended version of 42

6   U.S.C. § 1396d(a) (*see* Rule 12(c) Resp. (Dkt. # 40) at 18-19), Defendants drop their

7   assertion of this argument in their reply memorandum (Rule 12(c) Reply at 10-11).

8   Accordingly, based on the amended definition of "medical assistance" in 42 U.S.C.

9   § 1396d(a), the court denies Defendants' motion to dismiss Mr. Dunakin's claim under

10  Title XIX of the Social Security Act on this ground.[11]

11  //

12  //

13

_____

14  [11] Defendants also argue that Mr. Dunakin fails to state a claim because a PASRR
15  evaluation is not a Medicaid service or benefit. (Rule 12(c) Reply at 10.) Defendants, however,
    raise this argument for the first time in their reply memorandum, and on this basis alone, the
16  court may decline to consider this argument. *See In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005)
    (finding an issue waived where it was raised for the first time in a reply brief before the district
    court). Nevertheless, the court disagrees with the substance of Defendants' argument as well.
17  The federal government pays "an amount equal to the Federal medical assistance percentage . . .
    of the total amount expended . . . as medical assistance under the State plan." 42 U.S.C.
18  § 1396b(a)(1). The federal regulations provide that PASRR activities conducted by the State are
    eligible for federal financial participation at a rate of 75 percent. 42 C.F.R. § 433.15(b)(9).
19  Thus, when it comes to paying for PASRR activities, the federal government apparently
    considers the amounts expended "as medical assistance under the State plan." Further, Mr.
20  Dunakin alleges that he has been deprived of not only an appropriate PASRR evaluation, but also
    the specialized services that he can access only through a PASRR evaluation, such as a supported
21  living program in a community-based setting or specialized services in his nursing home so he
    can develop the independent living skills he needs to live outside the nursing facility. (*See*
22  Compl. ¶¶ 16, 30, 32.) Thus, the court denies Defendants' motion to dismiss on this ground.

1          **b.   Medicaid Comparability**

2          The "comparability" requirement of the Medicaid Act is set forth in 42 U.S.C.

3    § 1396a(a)(10)(B)(i), which provides that a state plan for medical assistance made

4    available to an individual "shall not be less in amount, duration, or scope than the

5    medical assistance made available to any other such individual . . . ." *Id.*; *see also* 42

6    C.F.R. § 440.240.[12]  The comparability requirement "mandates comparable services for

7    individuals with comparable needs and is violated when some recipients are treated

8    differently than others where each has the same level of need." *Cota v. Maxwell-Jolly*,

9    688 F. Supp. 2d 980, 993 (N.D. Cal. 2010); *see Sobky v. Smoley*, 855 F. Supp. 1123,

10   1140-41 (E.D. Cal. 1994) ("The present language of the statute [42 U.S.C.

11   § 1396a(a)(10)(B)(i)] . . . expressly requires that any categorically needy individual

12   receive medical assistance not less in amount, duration, and scope than that received 'by

13   any other such individual.'").

14          Mr. Dunakin asserts that he has pleaded that he and other individuals with

15   intellectual disabilities and related conditions do not have the specialized services that

16   constitute "active treatment," and that those services are provided to other similarly

17   needy individuals placed in Defendants' intermediate care facilities for individuals with

18   intellectual disabilities ("ICF-IIDs").  (Rule 12(c) Resp. at 19.)  Mr. Dunakin argues that

19   _____

20          [12] Defendants devote considerable briefing space to an argument that the federal
     regulations cited by Mr. Dunakin in his complaint do not relate to comparability but rather to
21   topics such as outpatient hospital services and rural health clinics, which were not pleaded.
     (Rule 12(c) Mot. at 18-19.)  However, Defendants are apparently analyzing the wrong citation—
22   42 C.F.R. § 440.20 instead of 42 C.F.R. § 440.240—when they make this argument.  (*See id.*);
     *compare* 42 C.F.R. § 440.240 *with* 42 C.F.R. § 440.20.

1    Defendants efforts to reform the State's PASRR program did not include the

2    approximately 300 people with developmental disabilities and related conditions who

3    were living in privately-operated nursing facilities.  (*Id.* at 20 (citing Appendix A to the

4    complaint (Dkt. # 1-1) (attaching a copy of DDA's 2014 Supplemental Budget stating

5    that DDA's "immediate steps" to reform the PASRR program "do not address the issue

6    of the approximately 300 people with developmental disabilities who are currently in

7    community nursing facilities.")).)  He further argues that "[e]ven five months after the

8    lawsuit was filed, [D]efendants' Rule 30(b)(6) witness testified that only a few [of these

9    individuals] were actually receiving specialized services."  (Rule 12(c) Resp. at 20.)

10           Although pleading such a claim may be feasible, Mr. Dunakin has failed to do so

11   here.  The facts he describes in his response may have been developed in discovery, but

12   they are not adequately pleaded in his complaint.  In his response to Defendants' motion

13   to dismiss, Mr. Dunakin cites several provisions of his complaint (*see* Rule 12(c) Resp. at

14   19 (citing Compl. ¶¶ 22-23, 26,-32)), but the claim described above is not to be found

15   within them.  Accordingly, the court grants Defendants' motion to dismiss Mr. Dunakin's

16   claim based on Medicaid comparability.  However, as discussed below, the court also

17   grants Mr. Dunakin leave to amend his complaint with respect to this claim.

18           **c.  Meaningful Choice of Provider Provision**

19           Mr. Dunakin bases his third claim under Title XIX of the Social Security Act on

20   one of the "free choice" provisions of the Medicaid Act.  (*See* Compl. ¶ 44 (citing 42

21   U.S.C. §§ 1396n(c)(2)(B) and (C)).)  The portion of the Medicaid Act at issue relates to

22   the federal home- and community-based services ("HCBS") waiver program, which

ORDER- 37

1   allows states to be reimbursed for providing beneficiaries with noninstitutional care, so

2   long as the cost of providing this care is less than or equal to the cost of caring for the

3   same beneficiaries in more traditional long-term institutions.  *See Ball v. Rodgers*, 492

4   F.3d 1094, 1107 (9th Cir. 2007).  HCBS waivers, however, are only available if a state

5   provides certain "assurances" to the Secretary of Health and Human Services.  *Id.* (citing

6   42 U.S.C. § 1396n(c)(2), (d)(2)).  Section 1396n(c)(2)(C), upon which Mr. Dunakin

7   relies, provides that certain individuals, as defined in § 1396n(c)(2)(B),

8   
9   
10  
> who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded.

11  42 U.S.C. § 1396n(c)(2)(C).

12          Defendants assert without citation to legal authority that 42 U.S.C. § 1396n(c)(2)

13  "cannot form a basis for relief" because it "relates only to waivers" for state Medicaid

14  plans.  (Rule 12(c) Mot. at 20.)  The Ninth Circuit, however, has expressly held that

15  Medicaid beneficiaries "enjoy individual rights under [42 U.S.C. § 1396n(c)(2)(C)] that

16  can be enforced under § 1983."  *Ball*, 492 F.3d at 1103; *see also id.* at 1107.  The Ninth

17  Circuit has described § 1396n(c)(2) as conferring to eligible individuals "two explicitly

18  identified rights—(a) the right to be informed of alternatives to traditional long-term

19  institutional care, and (b) the right to *choose* among those alternatives."  *Id.* at 1107

20  (italics in original).  Mr. Dunakin has alleged that Defendants never informed him of his

21  feasible alternative placements as required by the Medicaid meaningful choice of

22

1    provider provisions.  (*See* Compl. ¶¶ 16-17, 28-31, 44.)  Accordingly, the court denies

2    Defendants' motion to dismiss Mr. Dunakin's claim under Title XIX of the Social

3    Security Act on this ground.  *See, e.g.*, *Rolland v. Cellucci*, 52 F. Supp. 2d 231, 241 (D.

4    Mass. 1999) (ruling that, although issues remained concerning the breadth of 42 U.S.C. §

5    1396n(c)(2)(C) and whether alleged alternatives were, in fact, feasible, the plaintiffs had

6    stated a claim where they alleged that the defendants denied them their freedom of choice

7    by failing to inform them of feasible alternatives to nursing facilities).

8            **d.  Adequate Notice of Defendants' Determinations**

9            Mr. Dunakin alleges that Defendants violated Title XIX of the Social Security Act

10   by failing to provide Medicaid benefits "with adequate written notice of [D]efendants'

11   determinations, as well as the[] right to appeal to [D]efendants' administrative hearing

12   process, pursuant to 42 C.F.R. § 431.200 *et seq.*"  (Compl. ¶ 44.)  Defendants argue that

13   Mr. Dunakin has not identified any action on their part that entitled him to notice or the

14   notice to which he was entitled but that they failed to provide or provided improperly.

15   (Rule 12(c) Mot. at 21.)  Yet, Mr. Dunakin alleges that Defendants never provided him

16   with notice about the results of his initial PASRR Level I screening, his entitlement to a

17   PASRR Level II evaluation, the availability of specialized services, or the possibility of

18   alternative community-based placement.  (Compl. ¶¶ 16, 30-31.)  He also alleges that

19   Defendants' PASRR system as a whole failed to provide "adequate notice and due

20   process" regarding his and the proposed class's "eligibility for Medicaid services

21   (including placement in a less restrictive setting and specialized services) and their rights

22

1    to appeal any determination through an administrative hearing."  (*Id.* ¶ 17; *see also id.*

2    ¶¶ 31, 44.)  These factual allegations are sufficient.

3         Defendants also complain that Mr. Dunakin's reference to "42 C.F.R. § 431.200 *et*

4    *seq.*" is too vague and forces them to guess which specific provisions are at issue.  A

5    plaintiff, however, is not required to plead the law, only facts.  "To survive a motion to

6    dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

7    claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*,

8    550 U.S. at 570).  Indeed, although the court must accept well-pleaded facts as true when

9    considering a Rule 12(c) motion,[13] it is not required to accept conclusions of law.  *See id.*

10   at 678-79.  Thus, Mr. Dunakin's reference to "42 C.F.R. § 431.200 *et seq.*" does not

11   undermine the adequacy of his allegations.  The court denies Defendants' motion to

12   dismiss this portion of Mr. Dunakin's complaint.[14]

13       **5.   Leave to Amend the Complaint**

14        The court granted Defendants' Rule 12(c) motion with respect to Mr. Dunakin's

15   claim based on the "comparability" requirement of the Medicaid Act as set forth in 42

16   U.S.C. § 1396a(a)(10)(B)(i).  (*See* Compl. ¶ 44(2).)  When the court grants a motion to

17   dismiss, it must also decide whether to grant leave to amend.  *Mora v. Countrywide*

18

19        [13] The applicable standard on a Rule 12(c) motion is essentially identical to the standard for a motion to dismiss under Rule 12(b)(6).  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011).

20

21        [14] Defendants' only basis for seeking dismissal of Mr. Dunakin's fifth and sixth claims for declaratory and injunctive relief was the assumption that the court would grant its motion to dismiss claims one through four.  (*See* Rule 12(c) Mot. at 1-2, 23.)  Because the court has

22   granted dismissal of only one portion of Mr. Dunakin's fourth claim (and with leave to amend), the court denies Defendants' motion to dismiss Mr. Dunakin's fifth and sixth claims.

1  *Mortg.*. No. 2:11-cv-00899-GMN-RJJ, 2012 WL 254056, at *2 (D. Nev. Jan. 26, 2012).

2  Ordinarily, leave to amend a complaint should be freely given following an order of

3  dismissal. *See* Fed. R. Civ. P. 15(a)(2).  Generally, leave to amend is only denied when it

4  is clear that the deficiencies of the complaint cannot be cured by amendment.  *See DeSoto*

5  *v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) ("A district court does not

6  err in denying leave to amend where the amendment would be futile.").  It is not clear

7  that the deficiencies of Mr. Dunakins' claim based on the "comparability" requirement of

8  the Medicaid Act cannot be cured by amendment.  Accordingly, the court grants Mr.

9  Dunakin leave to amend his complaint with respect to this claim within 30 days of the

10  date of this order.  If Mr. Dunakin does not timely file an amended complaint addressing

11  this claim, the court will dismiss it.

12  **B.  Plaintiff's Motion for Class Certification**

13          The court next considers Mr. Dunakin's motion for class certification.  (*See*

14  *generally* Mot. for Cert.)  Mr. Dunakin brings his motion under Federal Rule of Civil

15  Procedure 23(b)(2).  Specifically, Mr. Dunakin seeks certification of a class that consists

16  of all individuals who:

17              (a) are or will be residents of Medicaid-certified, privately-operated nursing
                  facilities in the State of Washington; and
18              (b) who [sic] are Medicaid recipients with an intellectual disability or
                  related condition(s) such that they are eligible to be screened and
19                assessed pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.122 *et
                  seq.*
20
    (Compl. ¶ 14.)  The court finds that Mr. Dunakin has met the criteria for class
21
    certification under Rule 23(b)(2) and accordingly grants his motion as discussed below.
22

### 1.  Standards

A district court may certify a class only if all of the requirements of Federal Rule of Civil Procedure 23(a) are met, including:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a); *see also Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2548 (2011); *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).  These Rule 23(a) prerequisites are often referred to in shorthand as numerosity, commonality, typicality, and adequacy.

In addition to meeting the Rule 23(a) prerequisites, the party seeking class certification must also fall into one of three categories under Rule 23(b).  *Dukes*, 131 S. Ct. at 2548; *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).  Mr. Dunakin seeks certification pursuant to Rule 23(b)(2) only.  (*See* Mot. for Cert. at 3, 14-15.)  Certification is appropriate under Rule 23(b)(2) where the defendant has "acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Rule 23 "does not set forth a mere pleading standard."  *Dukes*, 131 S.Ct. at 2551.  Rather, certification is proper "only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  Indeed, in conducting the class certification

1   analysis, "it may be necessary for the court to probe behind the pleadings before coming

2   to rest on the certification question." *Id.* at 2551 (quoting *Falcon*, 457 U.S. at 160)

3   (internal quotation marks omitted).  This is because "the class determination generally

4   involves considerations that are enmeshed in the factual and legal issues comprising the

5   plaintiff's cause of action." *Id.* (internal quotation omitted).   Nonetheless, the ultimate

6   decision regarding class certification "involve[s] a significant element of discretion."

7   *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir. 2010).

8        **2.  Ascertainability**

9        Although not specifically mentioned in Rule 23, Defendants argue that Mr.

10  Dunakin must, in addition to showing numerosity, commonality, typicality, and

11  adequacy, demonstrate that the members of the proposed class are "ascertainable."  (*See*

12  Resp. to Cert. (Dkt. # 22) at 4 ("A class definition must be precise, objective, and the

13  class must be presently ascertainable.")  Under the ascertainability doctrine, the class

14  must be sufficiently definite so that it is feasible for the court to determine membership

15  by reference to objective criteria.  *See Williams v. Oberon Media, Inc*., 468 F. App'x 768,

16  770 (9th Cir. 2012) (citing *O'Connor v. Boeing N. Am. Inc*., 184 F.R.D. 311, 319 (C.D.

17  Cal. 1998) (holding that the district court did not abuse its discretion in denying the class

18  motion because the proposed members were not "precise, objective or presently

19  ascertainable")).  A class is sufficiently defined and ascertainable if it is "administratively

20  feasible for the court to determine whether a particular individual is a member."

21  *O'Connor*, 184 F.R.D. at 319; *accord Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo.

22  1995).

1    Although ascertainability may be applicable when considering certification of a

2    class under Rule 23(b)(3), many courts have determined that it is of less importance or

3    not applicable at all when considering certification under Rule 23(b)(2). *See, e.g.*,

4    *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) ("[I]t does not follow . . . that

5    ascertainability is always a prerequisite to class certification.  In the context of a (b)(3)

6    class, the requirement that the class be defined in a manner that allows for ready

7    identification of class members serves several important objectives that either do not exist

8    or are not compelling in (b)(2) classes.").  Courts have applied the ascertainability

9    doctrine differently in the two contexts due to the distinctions between a Rule 23(b)(2)

10   class and a Rule 23(b)(3) class.  *See Shelton*, 775 F.3d at 562.  Rule 23(b)(3) requires

11   finding that common questions of law or fact predominate over questions affecting only

12   individual members, and that a class action is superior to other methods of adjudication.

13   Fed. R. Civ. P. 23(b)(3).  Certification under Rule 23(b)(3) proceeds in a much wider set

14   of circumstances than certification under Rule 23(b)(1) or (b)(2), and accordingly

15   Congress included additional safeguards for (b)(3) class members, such as the

16   opportunity to opt out.  *See id.*; *see also Shelton*, 775 F.3d at 560.

17   On the other hand, "[t]he key to the (b)(2) class is the indivisible nature of the

18   injunctive or declaratory remedy warranted—the notion that the conduct is such that it

19   can be enjoined or declared unlawful only as to all of the class members or as to none of

20   them."  *Wal-Mart*, 131 S. Ct. at 2557 (internal quotations and citation omitted).  Indeed,

21   an Advisory Committee note to Rule 23 states that "illustrative" examples of a Rule

22   23(b)(2) class include "various actions in the civil-rights field where a party is charged

1   with discriminating unlawfully against a class, usually one whose members are incapable

2   of specific enumeration."  Fed. R. Civ. P. 23 advisory committee's note (1966).

3   Moreover, enforcement often does not require identification of individual members in a

4   Rule 23(b)(2) class because if relief is granted the defendants are legally obligated to

5   comply.  *Shelton*, 775 F.3d at 561.

6           Although the Ninth Circuit has not ruled on this issue, several other circuit courts

7   have held that, due to the unique characteristics of a Rule 23(b)(2) class, it is improper to

8   require ascertainability for a Rule 23(b)(2) class.  *See, e.g.*, *id.* at 559-63

9   ("[A]scertainability is not a requirement for certification of a (b)(2) class seeking only

10  injunctive and declaratory relief . . . .");  *Shook v. El Paso*, 386 F.3d 963, 972 (10th Cir.

11  2004) ("[M]any courts have found Rule 23(b)(2) well suited for cases where the

12  composition of the class is not readily ascertainable.");  *Yaffe v. Powers*, 454 F.2d 1362,

13  1366 (1st Cir. 1972) (holding that, because "notice to the members of a (b)(2) class is not

14  required . . . the actual membership of the class need not . . . be precisely delimited").

15  The court finds the reasoning of these decisions to be persuasive and adopts it here.

16          Other courts have certified very broadly defined Rule 23(b)(2) classes in which

17  members are defined by their eligibility for certain types of services or by a qualifying

18  condition.  *See, e.g.*, *Lane v. Kitzhaber*, 283 F.R.D. 587, 594 (D. Or. 2012) (certifying

19  Rule 23(b)(2) class of "[i]ndividuals with intellectual or developmental disabilities  . . .

20  who qualified for supported employment services"); *Rosie D. v. Romney*, 410 F. Supp. 2d

21  18, 22 (D. Mass. 2006) (certifying Rule 23(b)(2) class of children "who were (or might

22  become) eligible to receive, but were not receiving, what Plaintiffs described as

1   'intensive home-based services'"); *Katie A. v. Diana Bonta*, 433 F. Supp. 2d 1065, 1067

2   (C.D. Cal. 2006) (certifying class of foster children who "have a mental illness or

3   condition that has been documented or, had an assessment already been conducted, would

4   have been documented; and . . . who need individualized mental health services"),

5   *overruled on other grounds*, 481 F.3d 1150 (9th Cir. 2007); *K.M. Regence BlueShiled*,

6   No. C13-1214 RAJ, 2014 WL 801204, at *12 (W.D. Wash. Feb. 27, 2014) (certifying

7   Rule 23(b)(2) class of beneficiaries who "require neurodevelopmental therapy for the

8   treatment of a qualified mental health condition"). Indeed, Mr. Dunakin's proposed class

9   definition is similar to the one approved in another PASRR class action. *See Van Meter*

10  *v. Harvey*, 272 F.R.D. 274, 276 (D. Me. 2011). The court discerns no bar to certification

11  of the proposed class under Rule 23(b)(2) based on ascertainability here.

12      **3.  Numerosity**

13      The numerosity requirement is satisfied when "the class is so numerous that

14  joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no threshold

15  number of class members that automatically satisfies this requirement. *General Tel. Co.*

16  *Nw. v. EEOC*, 446 U.S. 318, 330 (1980). "Generally, 40 or more members will satisfy

17  the numerosity requirement." *Garrison v. Asotin Cnty.*, 251 F.R.D. 566, 569 (E.D. Wash.

18  2008); *see Wamboldt v. Safety–Kleen Sys., Inc*., No. C 07-0884 PJH, 2007 WL 2409200,

19  at *11 (N.D. Cal. Aug. 21, 2007) ("[N]umerosity is satisfied if the class comprises 40 or

20  more members."); *see also Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1319 (9th Cir.1982)

21  (class sizes of 39, 64, and 71 sufficient to satisfy numerosity requirement), *vacated on*

22  *other grounds*, 459 U.S. 810 (1982).

1    The question is whether joinder of all potential plaintiffs would be impracticable.

2    *See McCluskey v. Trs. of Red Dot Corp. Emp. Stock Ownership Plan & Trust*, 268 F.R.D.

3    670, 674 (W.D. Wash. 2010).  It is a long-standing rule that "impracticability" does not

4    mean "impossibility"; rather, impracticability means only "the difficulty or

5    inconvenience of joining all members of the class."  *Harris v. Palm Springs Alpine*

6    *Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal citations omitted).  In

7    assessing impracticability of joinder when the class size is not great, courts consider

8    factors such as "the geographical diversity of class members, the ability of individual

9    claimants to institute separate suits, and whether injunctive or declaratory relief is

10   sought."  *Jordan*, 669 F.2d at 1319; *see also McCluskey*, 268 F.R.D. at 674 (citing

11   Newberg and Conte, 1 Newberg on Class Actions § 3.6 (4th ed. 2002) ("[F]actors

12   relevant to the joinder impracticability issue include judicial economy arising from

13   avoidance of a multiplicity of actions, geographic dispersement of class members, size of

14   individual claims, financial resources of class members, the ability of claimants to

15   institute individual suits, and requests for prospective injunctive relief which would

16   involve future class members.")).

17       Based on DDA's data, Mr. Dunakin asserts that the projected size of the class is

18   approximately 300 people.  (Hamburger Decl. Ex. C at 2; *id.* Ex. E; Teed Decl. Ex. B at

19   100.)  This number, although not enormous, qualifies under the standards described

20   above.  If, as alleged, Defendants have failed to institute a PASRR system that complies

21   with the requirements of federal law, then many, if not all, of these individuals, and

22   perhaps more, have been or will be injured by Defendants' failure to provide proper

ORDER- 47

1   PASRR screening and evaluation.  Further, all of the proposed class members suffer from

2   disabilities, are residents of privately-operated nursing facilities spread across the state,

3   and are low-income Medicaid recipients.  Defendants have not disputed the

4   impracticability of joinder in these factual circumstances (*see* Resp. to Cert. at 12-13),

5   and the court finds that these circumstances render individual suits by the putative class

6   members here to be impracticable.  *See Van Meter*, 272 F.R.D. at 282 ("[D]isability,

7   confinement and financial difficulty, and the inability of class members to bring their

8   own separate actions have been found to be factors strongly weighing against the

9   practicability of joinder.").

10       Defendants nevertheless argue that Mr. Dunakin has not proven numerosity

11  because Defendants' own data is imprecise and therefore the exact number of PASRR-

12  eligible nursing home residents is impossible to determine.  (*See* Resp. to Cert. at 13

13  ("DDA has compiled a list of individuals who are either DDA clients, or whose minimum

14  data sets *suggest* they might be eligible for PASRR.") (italics in original).)  However,

15  because he seeks only declaratory and injunctive relief, Mr. Dunakin does not need to

16  establish the precise number of class members to demonstrate numerosity.  *Kenneth R. ex*

17  *rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 265 (D.N.H. 2013) ("The exact

18  number of class members need not be established, particularly where only declaratory

19  and injunctive relief is sought.") (internal quotations and alterations omitted); *see also*

20  *Jordan*, 669 F.2d at 1319 n.9.  The court finds that Mr. Dunakin has met his burden of

21  demonstrating numerosity.

22  *//*

### 4.   Commonality

To satisfy commonality, the plaintiff must demonstrate that "there are common questions of law or fact to the class." Fed. R. Civ. P. 23(a)(2). "Commonality" is met through the existence of a "common contention" that is of "such a nature that it is capable of classwide resolution." *Dukes*, 131 S. Ct. at 2551. A contention is capable of classwide resolution if "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Accordingly, "what matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* This requirement is "construed permissively." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Accordingly, "[a]ll questions of fact and law need not be common to satisfy the rule." *Id.*; *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010). Indeed, commonality poses a "limited burden" because it "only requires a single significant question of law or fact." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012).

Mr. Dunakin asserts the following "overarching" common question of law and fact: Do defendants have a PASRR program in place for Medicaid-certified privately-operated nursing facilities that meets all relevant federal requirements? (Reply for Cert. (Dkt. # 33) at 4.) He asserts several additional common questions regarding putative class members' access to appropriate and adequate services: (1) Do Defendants have a PASRR program in place to properly screen and assess individuals with intellectual

1 disabilities or related conditions residing in Medicaid-certified, privately-operated

2 nursing facilities, consistent with federal law and regulations?  (2) Do defendants

3 provide, with reasonable promptness, all specialized services identified by the PASRR

4 process to proposed class members?  (3) Do Defendants properly determine whether

5 individuals with intellectual disabilities and related conditions residing in Medicaid-

6 certified, privately-operated nursing facilities want to live in less restrictive, community-

7 based settings and, if so, provide for class members to access those less restrictive

8 community-based settings?  (4) Do Defendants provide adequate notice and the

9 opportunity to appeal adverse decisions to individuals with intellectual disabilities or

10 related conditions residing in Medicaid-certified, privately operated nursing facilities

11 regarding their eligibility for Medicaid services (including PASRR screening,

12 assessment, specialized services and placement in a less restrictive community-based

13 setting)?  (*Id.*; *see also* Mot. for Cert. at 10.)

14        In response, Defendants do not challenge Mr. Dunakin's common questions

15 directly.  Rather, Defendants assert that the foregoing questions "presume[] that every

16 member of the class has already been identified as an individual with an intellectual

17 disability or related condition."  (Resp. to Cert. at 10.)  Defendants assert that because

18 there is uncertainty concerning the existence of an intellectual disability in each class

19 member, "[t]he issues presented as 'common' to the class are completely hypothetical."

20 (*Id.*)  Mr. Dunakin's proposed class, however, is based on the number of individuals who

21 Defendants themselves have identified as having an intellectual disability or as being a

22 DDA client and who are currently residing in community-based nursing facilities.  (*See*

ORDER- 50

1  Hamburger Decl. Ex. C at 2; *id.* Ex. E at 100.)  Thus, while some number of these

2  individuals may have been misidentified by Defendants, there is no basis for assuming

3  that number is significant.  Indeed, Defendants represented in DDA's 2014 Supplemental

4  Budget that the number of individuals at issue was "approximately 300."  (*See id.* Ex. C

5  at 2.)  If DDA felt confident enough to place this figure in its 2014 Supplemental Budget,

6  then the court is satisfied that Mr. Dunakin's common questions are not "hypothetical,"

7  and he has demonstrated commonality.

8  **5.  Typicality**

9  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with

10  those of absent class members; they need not be substantially identical."  *Hanlon*, 150

11  F.3d at 1020.  "Typicality refers to the nature of the claim or defense of the class

12  representative, and not to the specific facts from which it arose or the relief sought."[15]

13  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  In determining

14  typicality, courts consider "whether other members have the same or similar injury,

15  whether the action is based on conduct which is not unique to the named plaintiffs, and

16  whether other class members have been injured by the same course of conduct."  *Id.* at

17  508.  "Under the rule's permissive standards, representative claims are 'typical' if they

18  are reasonably co-extensive with those of absent class members; they need not be

19

20  _____

21  [15] The "commonality and typicality requirements of Rule 23(a) tend to merge."  *Falcon*, 457 U.S. at 158 n.13.  "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Id.*

22

1    substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quotation

2    marks and citations omitted).

3        The Ninth Circuit has provided guidance on how to analyze typicality in a case

4    involving challenged policies or practices:

5        Where the challenged conduct is a policy or practice that affects all class
         members, the underlying issue presented with respect to typicality is similar
6        to that presented with respect to commonality, although the emphasis may
         be different.  In such a case, because the cause of the injury is the same—
7        here, the [defendant's] discriminatory policy and practice—the typicality
         inquiry involves comparing the injury asserted in the claims raised by the
8        named plaintiffs with those of the rest of the class.  We do not insist that the
         named plaintiffs' injuries be identical with those of the other class
9        members, only that the unnamed class members have injuries similar to
         those of the named plaintiffs and that the injuries result from the same,
10       injurious course of conduct.

11   *Parsons*, 754 F.3d at 687.  The Ninth Circuit has also cautioned, however, that "a named

12   plaintiff's motion for class certification should not be granted if there is a danger that

13   absent class members will suffer if their representative is preoccupied with defenses

14   unique to it."  *Id.*

15       Defendants' strongest argument against certification of the class lies in the

16   typicality requirement.  (Resp. to Cert. at 7-9.)  Defendants found a 2008 PASRR Level I

17   assessment in Mr. Dunakin's medical records after this lawsuit was filed, which indicates

18   that Mr. Dunakin does not qualify for a PASRR Level II assessment.  (*See* Hamburger

19   Decl. Ex. M.)  Defendants argue that this fact renders Mr. Dunakin not typical of the

20   putative class.  (Resp. to Cert. at 8-9.)  Indeed, they are essentially arguing the merits of

21   the case—that Mr. Dunakin is not typical because, based on his 2008 PASRR Level I

22

ORDER- 52

1    assessment, he is not entitled to any PASRR assessment, evaluation, or services.  (*See*

2    *generally* Kishel Decl. (Dkt. # 26).)

3           Defendants, however, ignore the larger picture surrounding Mr. Dunakin's alleged

4    experience with Defendants' PASRR policies and procedures.  Mr. Dunakin has

5    presented evidence of a 2006 PASRR I evaluation, which identified him as having

6    "Developmental Disability Indicators."  (Hamburger Decl. Ex. G.)  Yet, Mr. Dunakin

7    never received a PASRR Level II evaluation at that time.  Years later, in 2014, DDA

8    placed Mr. Dunakin on a list or report of DDA clients who were living in nursing homes.

9    (Hamburger Decl. Ex. H (Watling Rule 30(b)(6) Dep.) at 64:21-65:7.)  DDA has

10   acknowledged that the people on the report are individuals that it knows should receive a

11   Level II PASRR evaluation.  (*See* Teed Decl. Ex. B (Hehemann Rule 30(b)(6) Dep.) at

12   242:15-22.)  Yet, again, Mr. Dunakin did not receive such an evaluation.

13          Furthermore, Mr. Dunakin asserts that the 2008 PASRR Level I assessment, which

14   denied his eligibility for a PASRR Level II evaluation, was in error.[16]  Indeed,

15   Defendants have acknowledged that until recently they were applying the wrong standard

16   for PASRR eligibility.  (*See* PSJ Resp. at 1, 7.)  Thus, similar to Mr. Duankin's alleged

17   experience, there may be numerous inaccurate PASRR Level I or Level II evaluations in

18

19

20   _____

21          [16] Defendants have acknowledged that, if a PASRR Level I evaluation is in error, a new
     Level I should be completed and the resident referred for a Level II evaluation, if indicated.  (*See*

22   PSJ Resp. at 4; Hehemann Decl. ¶ 10; Hamburger Decl. Ex. D at 1.)

ORDER- 53

1  the medical records of residents of privately-operated nursing facilities.[17]  (*See id.* at 1

2  (acknowledging that developmental disability eligibility under state law and PASRR

3  determinations under federal law have different standards).)

4        Although the facts surrounding Mr. Dunakin's claims have grown more complex

5  as a result of discovery, the court concludes that his claims are nonetheless typical of the

6  putative class.  First, there is no dispute that Mr. Dunakin is a resident of a Medicaid-

7  certified, privately-operated nursing facility.  Although not uncontroverted, Mr. Dunakin

8  also has put forth substantial evidence that he suffers from a "related condition" to

9  intellectual disability.[18]  He also credibly asserts that he is entitled to PASRR screening

10  and assessment that Defendants have denied.  He argues that the 2008 PASRR Level I

11  assessment indicating that he is not entitled to a PASRR Level II assessment was

12  completed in error, contradicted by two separate determinations by Defendants indicating

13  he is entitled to a Level II assessment, and never corrected.   (Reply for Cert. at 6-7.)  He

14

---

15      [17] Defendants assert that "the State PASRR program is unaware of any individual that
was wrongfully excluded during the time period that the state eligibility standard was being used

16  in implementation of the PASRR program."  (PSJ Resp. at 7 (citing Hehemann Decl. ¶ 8).)  This
is not, however, confirmation that such individuals do not exist.  Indeed, Mr. Dunakin presents
evidence, albeit disputed, that he is a qualifying individual who was wrongfully excluded.

17  (*Compare* Hill Decl. (opining that Mr. Dunakin qualifies as a person with a "related condition"
under PASRR regulation 42 C.F.R. § 435.1010) *with* Kishel Decl. (opining that Mr. Dunakin

18  does not so qualify).

19      [18] (*Compare* Hill Decl. (concluding that Mr. Dunakin is a person with a "related
condition" to intellectual disability) *and* 2d Hill Decl. (Dkt. # 36) (concluding that there is no

20  basis for thinking that his lower cognitive functioning and other limitations were caused by
anything other than his congenital neuromuscular condition) *with* Kishel Decl. (concluding that

21  "it is impossible to conclude that Mr. Dunakin's neuromuscular condition 'is known by reputable
authorities to cause intellectual and adaptive skills deficits' as required by WAC 388-823-0600"

22  or  determine whether his "adaptive deficits are due to the neuromuscular disorder, physical
injury, and/or mental illness").)

ORDER- 54

1    also claims that he is entitled to a PASRR Level II assessment based on Defendants'

2    other evaluations.   (*Id.*)  Thus, like other putative class members, Mr. Dunakin claims

3    that he is eligible for screening, assessment, and services under PASRR, which

4    Defendants have failed to provide due to flawed PASRR policies and procedures.

5    Although Mr. Dunakin's injuries may not be identical to those of other class members,

6    his injuries are similar and "result from the same, injurious course of conduct" in which

7    Mr. Dunakin has alleged that Defendants are engaged.  *Parsons*, 754 F.3d at 687.

8         Defendants' arguments to the contrary essentially go to the merits of Mr.

9    Dunakin's claims.  Although "a court's class-certification analysis must be rigorous and

10   may entail some overlap with the plaintiff's underlying claim," *Dukes*, 131

11   S. Ct. at 2551 (internal quotation marks omitted), "Rule 23 grants courts no license to

12   engage in free ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn.*

13   *Ret. Plans and Trust Funds*, --- U.S. ---, 133 S. Ct. 1184, 1194-95 (2013).  *See also id.* at

14   1195 ("Merits questions may be considered to the extent—but only to the extent—that

15   they are relevant to determining whether the Rule 23 prerequisites for class certification

16   are satisfied."); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("In determining

17   the propriety of a class action, the question is not whether the plaintiff or plaintiffs have

18   stated a cause of action or will prevail on the merits, but rather whether the requirements

19   of Rule 23 are met.") (quoting with approval *Miller v. Mackey Int'l*, 452 F.2d 424, 427

20   (5th Cir. 1971); *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003) ("Although some

21   inquiry into the substance of a case may be necessary to ascertain satisfaction of the

22   commonality and typicality requirements of Rule 23(a), it is improper to advance a

1   decision on the merits to the class certification stage.").  Thus, the court need not and

2   should not determine whether Mr. Dunakin will ultimately prevail on his claims in the

3   context of this Rule 23 motion; rather, the court should determine whether Mr. Dunakin

4   has sufficiently demonstrated the requirements of Rule 23.  Based on the pleadings and

5   evidence submitted by the parties, the court concludes that Mr. Dunakin has met his

6   burden under Rule 23 of demonstrating that his claims are typical of the putative class.

7      **6.  Adequacy**

8      "To determine whether named plaintiffs will adequately represent a class, courts

9   must resolve two questions: '(1) do the named plaintiffs and their counsel have any

10   conflicts of interest with other class members and (2) will the named plaintiffs and their

11   counsel prosecute the action vigorously on behalf of the class?'"  *Ellis v. Costco*

12   *Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon*, 150 F.3d at 1020).

13      Defendants challenge Mr. Dunakin's adequacy as a class representative on the

14   same grounds on which they challenge typicality and commonality.  (*See* Resp. to Cert. at

15   14 ("Plaintiff does not appear to be a member of the putative class and has not suffered

16   the same injuries he alleges are common to the class.").)  The court relies on its reasoning

17   stated above addressing Defendants' arguments concerning those issues.  (*See infra* §§

18   III.B.4, III.B.5.)  Defendants do not identify any conflict of interest between proposed

19   class representatives and the class members, and the court is aware of none.  (*See* Resp.

20   to Cert. at 13-14.)  Furthermore, Mr. Dunakin's mother and next friend, Kimberlee

21   Hollinger, testifies that she and Mr. Dunakin are aware of and willing to fulfill the duties

22

1   and responsibilities associated with serving as a class representative.  (Hollinger Decl. ¶

2   8.)  The court, therefore, finds that Mr. Dunakin is an adequate class representative.

3          The competency of counsel has been largely subsumed under Rule 23(g) and the

4   requirement that the court appoint adequate class counsel.  Fed. R. Civ. P. 23(g)(1)(A)(i)-

5   (iv).  When appointing class counsel, the court considers the work Plaintiff's counsel has

6   done in identifying and investigating potential claims, counsel's experience with class

7   litigation and the types of claims at issue, counsel's knowledge of the applicable law, and

8   the resources that counsel will commit to representing the class.  *Id.*  The court may also

9   consider any other pertinent matter relevant to counsel's ability to adequately represent

10  the class.  Fed. R. Civ. P. 23(g)(1)(B).

11         Defendants "do not dispute the experience of Plaintiff's counsel."  (Resp. to Cert.

12  at 14.)  However, they challenge the adequacy of Plaintiff's counsel by asserting that

13  Plaintiff's memoranda in support of partial summary judgment and class certification

14  "demonstrates a fundamental misunderstanding of both DDA's actions and process, and

15  of the relevant law."  (*Id.*)  The court agrees with Mr. Dunakin that the parties'

16  disagreement over the law or how their dispute should be resolved is not a valid basis for

17  challenging the adequacy of counsel.  (*See* Reply to Cert. at 8 (citing Fed. R. Civ. P.

18  23(g)(1)(A)(i)-(iv)).)  Based on the evidence of their qualifications, prior experience in

19  class litigation, and specifically Medicaid and disability-related class litigation, and

20  willingness to commit the time and resources necessary to vigorously pursue this

21  litigation (*see generally* Kas Decl.; Hamburger Decl. ¶¶ 1-10), the court finds that

22  Plaintiff's counsel satisfies the requisite criteria for adequacy of representation.

ORDER- 57

### 7.   Rule 23(b)(2) Certification

As noted above, in addition to the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, Mr. Dunakin must demonstrate that class certification is appropriate under one of three categories in Rule 23(b).  *Dukes*, 131 S. Ct. at 2548.  Mr. Dunakin seeks certification only under Rule 23(b)(2).  (Mot. for Cert at 14-15; Reply to Cert. at 9-10.)  Certification of a class is appropriate under Rule 23(b)(2) where "the  party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b).  In *Dukes*, the Supreme Court explained that Rule 23(b)(2) certification is appropriate where injunctive or declaratory relief can be provided to the members of the class without engaging in a case-by-case analysis of the individual circumstances of each class member:

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. . . .  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

131 S. Ct. at 2557 (internal quotations and citations omitted).

Defendants assert that rule 23(b) certification is not appropriate here because Mr. Dunakin "has not established that . . . Defendants have taken, or refused to take, any actions "that apply generally to the class" or that any relief would be "appropriate respecting the class as a whole."  (Resp. to Cert. at 15 (quoting Fed. R. Civ. P. 23(b)(2)).)

1  Defendants argue that "determining what relief is available for a given individual in the

2  class would necessarily require evidentiary hearings on both whether that individual is a

3  member of the class at all, and what specific injury that individual may have incurred."

4  (*Id.*)

5        The court disagrees.  Mr. Dunakin is not asking the court to make separate

6  determinations concerning the individual services that are appropriate for each class

7  member.  Rather, class members seek relief from systemic barriers to proper treatment

8  and services.  Specifically, Mr. Dunakin seeks implementation of appropriate policies,

9  practices, and procedures by Defendants to ensure that putative class members are

10 screened and evaluated as required by the NHRA and the PASRR regualtions, informed

11 that they may be eligible for community-based services, and provided with appropriate

12 services by Defendants with reasonable promptness.  (*See* Compl. at 15.)  In other words,

13 he does not ask the court to order individualized remedies for the various class members;

14 instead, he asks the court for an order requiring Defendants "to develop a system of

15 evaluation and implementation of corresponding services that complies with federal

16 standards."  *See Van Meter v. Harvey*, 272 F.R.D. 274, 282 (D. Me. 2011).

17      *Van Meter* involves similar facts and is instructive here.  In *Van Meter*, Medicaid

18 recipients who were suffering from defined chronic disabilities brought a putative class

19 action alleging that the Maine Department of Health and Human Services ("DHHS")

20 violated the NHRA, Title II of the ADA, and the Rehabilitation Act by failing to ensure

21 that Plaintiffs received appropriate treatment in the most integrated setting possible.  *See*

22

1   *id.* at 275.  The court found class certification under Rule 23(b)(2) to be appropriate,

2   stating:

3       Plaintiffs allege a systemic problem with DHHS's procedures, and they
        seek injunctive and declaratory relief to change DHHS's conduct on an
4       agency-wide basis.  Such relief is appropriate respecting the whole class
        because if Plaintiffs' allegations prove correct, every putative class member
5       will be entitled to the relief.

6       . . . If the putative class members were to proceed on an individual basis,
        they might obtain the individual services they seek without obtaining
7       systemic changes to DHHS's conduct that would benefit the class as a
        whole, a result that could lead to countless individual claims seeking the
8       exact same relief.  Obtaining relief on a class-wide basis ensures an
        efficient judicial remedy to any deficiency in DHHS's conduct.
9
    *Id.* at 283-84.  The same is true here.  The court finds that Mr. Dunakin has demonstrated
10
    that his action falls within the parameters of Rule 23(b)(2).
11
            In sum, the court finds that Mr. Dunakin has demonstrated all of the prerequisites
12
    of Rule 23(a) and (b)(2).  Accordingly, the court grants Mr. Dunakin's motion for class
13
    certification and appoints him as class representative.  Consistent with its analysis above
14
    concerning Mr. Dunakin's counsel's qualifications (*see supra* § III.B.6), the court also
15
    appoints Susan Kas of Disability Rights Washington and Eleanor Hamburger of Sirianni
16
    Youtz Spoonemore Hamburger as class counsel.
17
    **C. The Parties' Motions for Partial Summary Judgment**
18
            Mr. Dunakin moves for partial summary judgment seeking a declaration that
19
    Defendants violate the NHRA when, in conducting PASRR screenings and evaluations,
20
    Defendants use the definition of "developmental disability" found in state regulations,
21
    rather than the definition of "intellectual disability and related conditions" found in
22

1    federal regulations.  (*See generally* PSJ Mot.)  Mr. Dunakin argues that Defendants'

2    misapplication of the state definition for "developmental disability" has resulted in the

3    improper denial of PASRR services to himself and other class members.  (*Id.*)

4           Defendants also move for partial summary judgment on two of Mr. Dunakin's

5    claims under Title XIX of the Social Security Act.  (*See* Rule 12(c) Mot. at 22-23.)

6    Defendants ask the court to enter summary judgment on Mr. Dunakin's claims that

7    Defendants failed to provide Medicaid benefits to him and class members with

8    reasonable promptness (Compl. ¶ 44(1)) and that they failed to provide adequate written

9    notice of Defendants' determinations, as well as the right to administratively appeal any

10   such determination (*id.* ¶ 44(4)).  (*See* Rule 12(c) Mot. at 22-23.)  The court now

11   considers these motions.

12   **1.  Standards for Review of a Motion for Summary Judgment**

13          Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

14   where the moving party demonstrates (1) the absence of a genuine issue of material fact

15   and (2) entitlement to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp.*

16   *v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658

17   (9th Cir. 2007).  The moving party bears the initial burden of production to show the

18   absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

19          If the moving party does not bear the ultimate burden of persuasion at trial, it can

20   show the absence of an issue of fact in two ways: (1) by producing evidence negating an

21   essential element of the nonmoving party's case, or, (2) by showing that the nonmoving

22   party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

1   *Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the

2   moving party will bear the ultimate burden of persuasion at trial, it must establish a prima

3   facie showing in support of its position on that issue.  *UA Local 343 v. Nor-Cal*

4   *Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must

5   present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.

6   *Id.* at 1473.

7           If the moving party meets its burden of production, the burden then shifts to the

8   non-moving party to designate specific facts demonstrating the existence of genuine

9   issues for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "may not rest upon the

10  mere allegations or denials of the [nonmoving] party's pleading," but must provide

11  affidavits or other sources of evidence that "set forth specific facts showing that there is a

12  genuine issue for trial"—that is, facts from which a factfinder could reasonably find in

13  the non-moving party's favor.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477

14  U.S. 242, 252 (1986).  In determining whether the factfinder could reasonably find in the

15  non-moving party's favor, "the court must draw all reasonable inferences in favor of the

16  nonmoving party."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

17  (2000).

18          **2.  Mr. Dunakin's Motion for Partial Summary Judgment Regarding**
            **Defendants' Use of State Rather Than Federal Definitions for PASRR**
19          **Eligibility**

20          Mr. Dunakin asserts that in conducting PASRR screenings and evaluations

21  Defendants improperly utilize the definition of "developmental disability" found in the

22  Washington Administrative Code, WAC §§ 388-823-0200, 388-823-0210, rather than the

1    definition of "intellectual disability and related conditions" found in the Code of Federal

2    Regulations, 42 C.F.R. §§ 483.102(b)(3), 435.1010.  (*See generally* PSJ Mot.)  In their

3    response, Defendants admit that, for an unspecified period of time, they applied the state

4    eligibility standard for the provision of state DDA services to implement the federal

5    PASRR program and that their use of the state eligibility standard for federal PASRR

6    purposes was in error.  (PSJ Resp. at 1 ("Defendants do not dispute that the [state]

7    developmental disability eligibility determinations and PASRR determinations have

8    different standards."); *id.* at 7; Heheman Decl. ¶ 8 ("[F]or a brief period of time, the state

9    eligibility definition, with the exception of age of onset, was being used to implement

10   PASRR, but that has since changed so that only the federal definition is being used.").)

11   They claim, however, that they have now corrected this problem—which would

12   essentially render Mr. Dunakin's motion for partial summary judgment moot.  (*See* PSJ

13   Resp. at 1 ("The contention that . . . Defendants currently apply the same standard [to

14   both state and PASRR eligibility determinations] is wrong.")  The court, however, is

15   unconvinced that the State's prior practice has been corrected with respect to Mr.

16   Dunakin and the other class members.

17         As an initial matter, it is important to take a close look at how the state and federal

18   eligibility standards compare with one another.  Under the federal PASRR program, CMS

19   considers a person to have intellectual disability if he or she has (1) "[a] level of

20   retardation (mild, moderate, severe or profound) described in the American Association

21   on Intellectual Disability's Manual on Classification in Intellectual Disability (1983)," or

22   (2) "[a] related condition as defined by [42 C.F.R.] § 435.1010."  *See* 42 C.F.R.

1   § 483.102(b)(3).  On the surface, these PASRR requirements seem similar to DDA's

2   requirements because to qualify for DDA services based on developmental disability, the

3   individual "must have [1] a diagnosis of intellectual disability . . . or [2] other condition

4   found by DDA to be closely related to intellectual disability or requiring treatment

5   similar to that required for individuals with intellectual disability."  WAC § 388-823-

6   0015 (in relevant part).  Thus, both programs require either (1) retardation (as it is

7   phrased in the federal regulations) or intellectual disability (as it is phrased in the state

8   regulations), or (2) a "related condition" (as it is phrased in the federal regulations) or a

9   "closely related" condition (as it is phrased in the state regulations).  The "similarity"

10  between the federal and state provisions, however, begins to break down when one

11  compares how the federal PASRR program defines "retardation" and "related condition"

12  to how the State defines "intellectual disability" and "closely related" condition.  The

13  devil, as they say, is in the details.

14      **a.  The Federal PASRR Regulations**

15      The critical issue underlying Mr. Dunakin's motion for partial summary judgment

16  centers on how the PASRR regulations define a "related condition" under 42 C.F.R.

17  § 435.1010.  The federal PASRR regulations define "[p]ersons with related conditions" to

18  mean individuals who have "a severe, chronic disability" that is attributable to cerebral

19  palsy, epilepsy, or any other condition, other than mental illness, that is "closely related

20  to [i]ntellectual [d]isability."  42 C.F.R. § 435.1010.  A condition is "closely related to

21  intellectual disability" if it "results in impairment of general intellectual functioning *or*

22  adaptive behavior similar to that of mentally retarded persons, and requires treatment or

ORDER- 64

1   services similar to those required for these persons." *Id.* (italics added).  It is not

2   necessary that a person exhibit both impairment of "general intellectual functioning" and

3   "adaptive behavior similar to that of mentally retarded persons." *Id.*  Only one of these

4   types of impairments is required.  *Id.*  In addition, the condition must manifest before the

5   individual reaches the age of 22 and be likely to continue indefinitely.  *Id.*  Finally, the

6   condition must result in "substantial functional limitations" in three or more "major life

7   activit[ies]," including:  (1) self-care, (2) understanding and use of language, (3) learning,

8   (4) mobility, (5) self-direction, and (6) capacity for independent living.  *Id.*

9         In addition, the federal regulations also set forth specific requirements regarding

10   the "minimum data" and "process requirements" necessary for the state intellectual

11   disability authority to determine whether or not a resident with intellectual disability

12   needs PASRR services.  42 C.F.R. § 483.136(a).  Using the data that the state is required

13   to compile, the state "must validate that the individual has [an intellectual disability] or is

14   a person with a related condition and must determine whether specialized services for

15   intellectual disability are needed."  42 C.F.R. § 483.136(c)(2).  The federal regulations

16   specify that "[i]n making this determination," the State "must make *a qualitative*

17   *judgment* on the extent to which the person's status reflects . . . the characteristics

18   commonly associated with the need for specialized services." *Id.* (italics added).

19   Further, the regulations contain an exhaustive list of the specific characteristics that the

20   state must consider in making its "qualitative judgment," including:  (1) demonstration of

21   the "[i]nability to-- (A) [t]ake care of the most personal care needs; (B) [u]nderstand

22   simple commands; (C) [c]ommunicate basic needs and wants; (D) [b]e employed at a

ORDER- 65

1 productive wage without systematic long term supervision or support; (E) [l]earn new

2 skills without aggressive and consistent training; (F) [a]pply skills learned in a training

3 situation to other environments or settings without aggressive and consistent training;

4 (G) [d]emonstrate behavior appropriate to the time, situation or place without direct

5 supervision; and (H) [m]ake decisions requiring informed consent without extreme

6 difficulty;" (2) "[d]emonstration of severe maladaptive behavior(s) that place the person

7 or others in jeopardy to health and safety;" and (3) "[p]resence of other skill deficits or

8 specialized training needs that necessitate the availability of trained [intellectual

9 disability] personnel 24 hours per day, to teach the person functional skills." 42 C.F.R.

10 § 483.136(c)(2)(i)-(iii).

**b. The State's Regulations and Distinctions with PASRR**

12          As noted above, under the state system, to qualify for DDA services based on

13 developmental disability, the individual "must have a diagnosis of [1] intellectual

14 disability . . . or [2] other condition found by DDA to be closely related to intellectual

15 disability or requiring treatment similar to that required for individuals with intellectual

16 disability." WAC § 388-823-0015 (in relevant part). In addition, the condition must

17 originate prior to age 18, be expected to continue indefinitely, and result in substantial

18 limitations. *Id.* Already, there is a distinction between the federal PASRR and the state

19 regulations because the state requires the condition to manifest prior to age 18 whereas

20 under PASRR the condition must manifest prior to age 22. *Compare* WAC § 388-823-

21 0015 *with* 42 C.F.R. § 435.1010. No one disputes, however, that Defendants were

22

1   always aware of the age distinction between the state and federal regulations and

2   correctly applied it.

3          It is the distinction between the PASRR regulations concerning "related condition"

4   and the state regulations concerning "closely related" condition that is at issue in this

5   motion.  To be considered eligible in Washington for state services under the category of

6   "other condition similar to intellectual disability," an individual must have "a diagnosis

7   by a licensed physician of a neurological or chromosomal disorder that is known by

8   reputable authorities to cause intellectual *and* adaptive skills deficits."  WAC § 388-823-

9   0600 (italics added).  In addition, the condition must, in part, originate before age 18, be

10  expected to continue indefinitely without improvement, not be attributable to mental

11  illness or emotional, social or behavioral disorder, and result in substantial functional

12  limitations.[19]  WAC § 388-823-0600(1).  In order to meet the definition of "substantial

13  functional limitations," the individual again "must have impairments in *both* intellectual

14  abilities *and* adaptive skills which are separate from any impairment due to unrelated

15  mental illness, or emotional, social or behavioral disorder."  WAC § 388-823-0610

16  (italics added).  Further, "evidence of substantial functional limitation requires

17  documentation of both: (1) "[f]or impairment in intellectual abilities . . . [a] FSIQ score of

18

19

20  _____

21      [19] In addition to the foregoing criteria, there are two other subsets of criteria, not at issue here, that meet the State's definition of "neurological or other condition similar to intellectual

22  disability."  *See* WAC § 388-823-0600(2), (3).

1    more than 1.5 standard deviations below the mean,"[20] WAC § 388-823-0610(1)(a)(i), and

2    (2) "[f]or impairment in adaptive skills, a score of more than two standard deviations

3    below the mean," WAC § 388-823-0610(1)(b).

4           The PASRR requirements with respect to "related condition" are substantially

5    different from the foregoing state regulations.  Although the state regulations require

6    impairment in both intellectual and adaptive skills, the PASRR regulations require

7    impairment in only one of these categories.  *Compare* WAC § 388-823-0600 *and* WAC

8    § 388-823-0610 *with* 42 C.F.R. § 435.1010 (defining "[p]ersons with related

9    conditions").  As noted above, Defendants have acknowledged that their prior failure to

10   recognize this difference was error.  (PSJ Resp. at 1, 7; Hehemann Decl. ¶ 8.)  Indeed, a

11   new form that Defendants use to train staff indicates that for a related condition under

12   PASRR a person need only demonstrate impairment in general intellectual functioning or

13   adaptive functioning, but not both.  (*See* Hehemann Decl. Ex. C.)  This form, however, is

14   dated October 31, 2014, which is only one month prior to Defendant's target date of

15   completing its implementation of PASRR enhancements in privately-operated nursing

16   facilities.  (*See* Hehemann Decl. ¶ 5.)  Further, there is no evidence that Defendants

17   understood this distinction between the state and federal regulations at any of the times

18   when they evaluated Mr. Dunakin for PASRR eligibility.  Indeed, all of Defendants'

19   testimony indicates that, until at least September 2014, they believed that the only

20   distinction between the state and federal regulations was the required age of onset.  (*See*

21   _____

22   [20] In addition, there are two other ways an individual may demonstrate impairment of intellectual disabilities, but neither is relevant here.  *See* WAC §§ 388-823-0610(1)(a)(ii), (iii).

1   Hamburger Decl. Ex. E at 82:16-83:1, 83:24; *id.* at 140:10-15; *id.* at 154:5-9; *id.* Ex. H at

2   87:12-88:3.)

3          The fact that Defendants acknowledged their error so late in the process is pivotal

4   with respect to Mr. Dunakin's motion.  The State contends that, beginning in April 2014,

5   it has revisited PASRR evaluations for at least 270 people in the class or approximately

6   90 percent of the class.  (*See* Hehemann Decl. ¶ 6 ("I can report that approximately 270

7   individuals in privately-operated Medicaid certified nursing facilities have been

8   reassessed for PASRR purposes since April 2014 using the current PASRR process and

9   systems.  This is over 90% of the individuals who we initially contemplated might

10  require review.").)  Indeed, Defendants expressed the goal of completing that process by

11  November 2014.  (*See* Hehemann Decl. ¶ 5.)  Yet, the undisputed evidence before the

12  court is that during most of this period of time—until at least September 2014—

13  Defendants were still applying what they now admit was the wrong standard for PASRR

14  evaluations.  (*See* Hamburger Decl. Ex. E at 82:16-83:1, 83:24; *id.* at 140:10-15; *id.* at

15  154:5-9; *id.* Ex. H at 87:12-88:3.)  Thus, despite Defendants' reassurance that they have

16  reassessed most of the class for PASRR eligibility, there is no evidence that these

17  reassessments were completed using the correct standard.

18         Second, there is no dispute that even in Defendants' revised PASRR materials,

19  they are still applying the wrong standard for PASRR assessments.  In their form for

20  PASRR Level II evaluations, Defendants instruct DDA staff and others who may be

21  completing the form to use state criteria for determining both intellectual disability as

22

1  well as a related condition under PASRR.  (*See* Hehemann Decl. Ex. B at 3.)

2  Specifically, the form instructs:

3      *[T]he determination of intellectual disability for PASRR purposes uses the*
       *state criteria under WAC 388-823-0200 through 230.  The determination of*
4      *"related condition",* [sic] *uses the state criteria for cerebral palsy,*
       *epilepsy, autism, another neurological condition or other condition similar*
5      *to intellectual disability in WAC 388-823-0300 through 0940, with the*
       *exception that the age of origination of the condition is under 22 (not under*
6      *18).*

7  (*Id.* (italics in original).)  Thus, this "revised" form reiterates the very error concerning a

8  "related condition"—that the only distinction between the federal and state definitions is

9  age of onset—that Defendants claimed to have abandoned in their recent PASRR

10 enhancements.

11      Finally, the federal PASRR regulations expressly direct that in determining

12 whether an individual has an intellectual disability or related condition, the evaluator

13 must make "a qualitative judgment" based on a variety of factors that are explicitly

14 enumerated.  42 C.F.R. § 483.136(c)(2)(i)-(iii).  There is no such requirement for making

15 a "qualitative judgment" in the State's regulations.  Indeed, the assessment of intellectual

16 disability or "closely related" condition under the State's regulations is much more

17 quantitative in nature—requiring specific FSIQ and adaptive skills test scores to qualify.

18 *See* WAC § 388-823-0210; WAC § 388-823-0610.  In addition, there is no evidence

19 before the court or indication in any legal source cited by the parties or that the court

20 could independently find that the state regulations mandate consideration of the

21 numerous characteristics required under the federal regulations to be a part of the

22 evaluator's "qualitative judgment."  *See* 42 C.F.R. § 483.136(c)(2).  Thus, it was also

ORDER- 70

error for the State to rely upon its own regulations for PASRR eligibility assessments when these specific factors mandated in the federal regulations were not incorporated into the state regulations.

Based on the foregoing, the court concludes that, despite Defendants' assurances that they has revised and enhanced their PASRR program to correct the deficiencies that Mr. Dunakin alleges, some of which Defendants acknowledge were in error, there is no evidence that Defendants were employing the correct PASRR standards at any time that they evaluated Mr. Dunakin for PASRR eligibility.  Further, there is no evidence that Defendants employed the correct PASRR standards when they reassessed various class members for PASRR purposes beginning in April 2014.  Accordingly, the court grants Mr. Dunakin's motion for partial summary judgment that (1) Defendants violated the NHRA and implementing regulations when they used state regulations as described above to evaluate Mr. Dunakin's and other class members' eligibility under PASRR, and (2) Defendants must employ the standards contained in the federal regulations when evaluating Mr. Dunakin and members of the class for PASRR purposes.

### 3.   Defendants' Motion for Partial Summary Judgment on Subsections One and Four of Claim Four

Defendants move for partial summary judgment with respect to subsections one and four of claim four in the complaint.  (Rule 12(c) Mot. at 22-23.)  Subsection one contains Mr. Dunakin's claim under Title XIX of the Social Security Act that Defendants failed to provide him with Medicaid benefits with reasonable promptness.  (Compl. ¶ 44(1) (citing 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A)).)  Subsection four contains Mr.

1    Dunakin's claim under the same statute that Defendants failed to provide him with

2    adequate written notice of their determinations and/or his right to an administrative

3    appeal.  (*Id.* ¶ 44(4) (citing 42 C.F.R. § 431.200, *et seq.*).)

4        Defendants argues that because Mr. Dunakin received a PASRR Level I screen in

5    2008 that determined he did not need a PASRR Level II evaluation, they are entitled to

6    summary judgment with respect to his claims that he was denied Medicaid services with

7    reasonable promptness and that they failed to provide him with adequate notice of their

8    determinations and his right to appeal.  (Rule 12(c) Mot. at 22-23.)  They argue that they

9    have no duty to provide Medicaid services in the event of a PASRR Level I screen that

10   determines an individual does not have an intellectual disability.  (*Id.* at 23 (citing 42

11   C.F.R. § 483.120(b)).)  They also argue that they have no duty to provide notice or

12   specialized services under PASRR because he did not receive a PASRR Level II

13   evaluation.  (*Id.* at 22-23 (citing 42 C.F.R. §§  431.200, 431.201, 483.120(b)).)

14       Even assuming that Defendants' analysis of the law is correct, there are serious

15   factual flaws with their argument.  First, there is evidence indicating that Mr. Dunakin

16   received a PASRR Level I screen in 2006 that called for Defendants to conduct to a

17   PASRR Level II evaluation.  (Hamburger Decl. Ex. G.)  Defendants may criticize the

18   validity of the 2006 PASRR Level I screen (*see* Rule 12(c) Reply (Dkt. # 42) at 2

19   (asserting that it was created by a chiropractor)), but it nevertheless raises an issue of fact

20   regarding Mr. Dunakin's claim for lack of inadequate notice under subsection four of

21   claim four.  Specifically, there is no evidence that Defendants provided Mr. Dunakin

22   notice that he was "suspected" of having an intellectual disability or related condition

1    following his 2006 PASRR Level I screen.  Such notification is required.  *See* 42 C.F.R.

2    § 483.128(a) ("The State's performance of the Level I identification function must

3    provide at least . . . for the issuance of written notice to the individual or resident and his

4    or her legal representative that the individual or resident is suspected of having . . . [an

5    intellectual disability] and is being referred to the State . . . intellectual disability

6    authority for Level II screening.").

7            Further, Defendants' motion is premised on the notion that there is no question of

8    fact that Mr. Dunakin is not entitled to a PASRR Level II examination or Medicaid

9    services due to his 2008 PASRR Level I screen that stated no Level II evaluation was

10   required.  Defendants' motion ignores evidence presented by Mr. Dunakin that raises

11   issues of fact with respect to his entitlement to both a PASRR Level II evaluation and

12   resulting Medicaid services.  First, Defendants ignore Mr. Dunakin's 2006 PASRR Level

13   I screen indicating that Mr. Dunakin should receive a PASRR Level II evaluation and

14   that it was sent to Defendants via facsimile.  (Hamburger Decl. Ex. G.)  Second,

15   Defendants ignore evidence that Mr. Dunakin was a DDA client through the date on

16   which this lawsuit was filed and that Defendants have a policy that DDA clients are

17   presumptively "PASRR eligible."  (Hehemann Decl. Ex. C at 1 ("If the person is a DDA

18   client, you may assume that he or she is PASRR eligible.").)  Third, Defendants ignore

19   evidence that they had placed Mr. Dunakin on a list of individuals who were DDA

20   clients, who were living in nursing homes, and who they believed needed to have PASRR

21   Level II evaluations.  (*See* Hamburger Decl. Ex. H at 64:9-65:7.)  Fourth, Defendants

22   ignore evidence that, since 1999, they had considered Mr. Dunakin to have a "related

ORDER- 73

1   condition" to intellectual disability due to his muscular dystrophy and his severe adaptive

2   behaviors (*id.* Ex. J (attaching letter from DSHS to Mr. Dunakin dated April 12, 1999,

3   stating that he is eligible for state services "based on the scores you received on the

4   assessment tool Inventory for Client and Agency Planning (ICAP)")), and they had

5   provided corresponding services, including supported employment and personal care

6   services (*id.* Ex. I at 43, 45). Finally, in contravention to Dr. Kishel's declaration, Mr.

7   Dunakin submits declarations from Dr. Hill in which she opines that Mr. Dunakin has a

8   "related condition" to intellectual disability as defined in 42 C.F.R. § 435.1010. (Hill

9   Decl. ¶ 2; *see also* 2d Hill Decl.) All of the foregoing evidence creates issues of fact with

10  respect to Mr. Dunakin's Title XIX claims. Accordingly, the court denies Defendants'

11  motion for partial summary judgment with respect to subparts one and four of claim four

12  in the complaint.

### IV.   CONCLUSION

14      Based on the foregoing, the court GRANTS in part and DENIES in part

15  Defendants' motion for judgment on the pleadings and for partial summary judgment

16  (Dkt. # 24). Specifically, the court grants dismissal with respect to Mr. Dunakin's claim

17  based on the "comparability" requirement of the Medicaid Act as set forth in 42 U.S.C.

18  § 1396(a)(10)(B)(i), but the court also grants Mr. Dunakin leave to amend his complaint

19  with respect to this claim within 30 days of the date of this order as described above. In

20  all other respects, the court denies Defendants' motion. The court GRANTS Mr.

21  //

22  //

ORDER- 74

1   Dunakin's motions for class certification (Dkt. # 16) and for partial summary judgment

2   (Dkt. # 17) as described in detail above.

3          Dated this 10th day of April, 2015.

4

5

6          _____

7          JAMES L. ROBART
           United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 75